## In The Matter of BRATEN APPAREL CORPORATION, Debtor-Appellant,

### Bankers Trust Company, Petitioner-Appellee.

### No. 82 Civ. 5712 (GLG).

United States District Court, S.D. New York.

Feb. 3, 1983.

Garrity, Connolly, Lewis, Lowry & Grimes, New York City, for debtor-appellant; Bernstein & Obstfeld, P.C., New York City, of counsel.

Moses & Singer, New York City, for petitioner-appellee; David B. Eizenman, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

Appellate fact-finding is an atrocity. Whether such review is based upon the parties' briefs, a law clerk's bench memorandum, or even a personal reading of the record (which in this case consists of 2700 pages of trial testimony and 275 documents), it is always inferior to the original consideration of the evidence that has been given by the judge who personally presided over the trial. Despite this inherent shortcoming in appellate fact-finding, the debtor in this bankruptcy action asks this Court to overturn as "clearly erroneous" the factual findings of Bankruptcy Judge Roy Babitt, who, before deciding in a sixty-five page opinion that fraud had been practiced upon his bankruptcy court, listened to eighteen days of vague and conflicting testimony.

Hopefully, the following summary of the evidence and the findings of fact, which are discussed in greater detail by Judge Babitt, does no injustice to his well written opinion.

BACKGROUND

The debtor-appellant, Braten Apparel Corporation ("BAC"), is a clothing manufacturer which was incorporated by Milton Braten in 1968 and owned by him and his father-in-law. In 1971, the petitioner-appellee, Bankers Trust Company ("Bankers Trust"), entered into an agreement with BAC by which the latter obtained financing through a revolving credit arrangement. BAC prospered until the spring of 1974, when it began to experience financial difficulties, due in part to industry conditions.

In the summer of 1974, BAC learned of a potentially lucrative opportunity: the chance to purchase the Brookfield Division (the "Division") of the Philips Van Heusen Corporation, which was to be divested after several years of operating at a loss. Because the Division had previously been independently owned and operated by Herman Soifer, a friend of the Braten family who was then in retirement, he too was contacted regarding the acquisition. Unwilling from the outset to invest any of his own money in the venture, Soifer soon reached an agreement with the Bratens whereby he would manage the business, once it was acquired, but the Bratens alone would be responsible for raising all of the capital necessary for closing the deal and starting the operation. Soifer claims that because of this arrangement he never discussed any financial details with the Bratens and, until the very end of August, remained unaware of BAC's unsound financial condition. The same reason was offered to explain why, although both Soifer and BAC's president, Milton Braten, negotiated the terms of the deal with Philips Van Heusen, only Braten approached Bankers Trust in search of credit for the new venture.

Bankers Trust was aware of BAC's problems, however, and refused to extend the company further credit. Nonetheless, because the Division could be acquired in exchange for an agreement to assume its substantial debts and without the payment of cash, the acquisition negotiations continued and a closing date of August 7, 1974, was set. The papers that were prepared stated that Philips Van Heusen was the seller, BAC the acquirer, and "Brookfield Industries," a wholly owned subsidiary of BAC, the acquiring entity. The documents made no mention of Soifer, and he has since testified that, as of that time, he believed that he had no ownership interest in Brookfield Industries.

When soon thereafter a problem arose with respect to the use of the name "Brookfield Industries," a new subsidiary of BAC, "MBC Apparel Corporation," was created to serve as the acquiring entity. A few days later yet another name was adopted, and the acquiring entity became, once and for all, "Brookfield Clothes, Incorporated" (hereafter referred to simply as "Brookfield"). Delays caused by these name changes resulted in a postponement of the closing until August 12.

At about that time, Chase Manhattan Bank ("Chase") insisted that if it were to continue as Brookfield's factor, Milton Braten and Soifer would have to give personal guarantees of $250,000 each. Soifer agreed to do this after Braten allegedly advised him that BAC had no money available to invest in the new business. Both personal guarantees were given on August 13, at which point Brookfield began operations under Soifer's management, even though no specific agreement as to Soifer's precise place in the business appears to have been reached.

During the last stages of the negotiations and the closing itself, an attorney by the name of Walter Feldesman, who was both a friend of the Bratens and an acquaintance of Soifer, appeared on the scene to assist with the acquisition. Two questions about his role at that time were not convincingly answered by Feldesman and the others during the trial. First, there was disagreement about who his client had been: while at one point he had appeared to be representing both Soifer and Braten, it was later claimed that he had been representing only Soifer. Second, no one offered a credible explanation of why Feldesman's expertise had been needed approximately two weeks

before Soifer had allegedly learned of BAC's unsound financial condition.

It appears that the seriousness of that condition began to become known on August 23, when BAC's independent auditors reported very heavy losses and a substantial negative net worth for the company.[1] By August 26, it was clear that BAC would have to follow the advice of its regular counsel, Jules Hessen, to inform Bankers Trust of the auditors' findings and request further financing. (Hessen then resigned as counsel for BAC, purportedly because his firm did not customarily represent debtors.) When Braten followed Hessen's advice later that day, Bankers Trust again indicated that it would extend no additional credit to BAC. The bank also inquired into the status of the acquisition of Brookfield, but Braten answered that he did not know what the exact status was and that he had left all the relevant papers with Soifer's attorney. Since then, he has acknowledged that what he actually thought was that BAC already had an interest in Brookfield and would continue to be involved with it.

Whatever his thoughts may have been then, he made no reference to Brookfield in the Chapter 11 petition that he filed for BAC ten days later on September 5, 1974. Rather, he declared that BAC owned no other assets of value and had made no transfers of property or any other dispositions outside the ordinary course of business. Indeed, this declaration was consistent with an article published a few days earlier in a textile industry newspaper, which was headlined: "Soifer Now Sole Brookfield Owner." How and when any such transfer of ownership from BAC to Soifer occurred is the subject of the controversy before the Court.

The most critical piece of evidence in that controversy is a shareholders' agreement between Braten and Soifer which was drafted by Feldesman sometime during August. According to Feldesman, it was drafted without negotiation or discussion with Braten, who, in turn, signed it without having consulted his own counsel. Although dated August 7, 1974, the agreement clearly was not signed until later. Soifer, for instance, admitted that he did not sign it until sometime after executing his personal guarantee on August 13. In fact, as Judge Babitt noted, it appears that the agreement could have been signed as late as August 27.

The critical terms of the agreement for purposes of this action were twofold. First, BAC and the Soifer Trust[2] were each initially to own twenty shares of Brookfield stock, or the equivalent of one-half of its total of forty issued and outstanding shares. Second, BAC agreed that if by August 24 it had not furnished Brookfield with a subordinated loan of $250,000, BAC would forfeit its fifty percent stock interest to the Soifer Trust, leaving the latter as the sole owner of Brookfield.

Early on the morning of August 27, Braten met Feldesman at his office and obtained from him a copy of the shareholders' agreement. Then, according to Braten, without even discussing any of the critical matters with Feldesman, he departed for Bankers Trust to show its representatives the agreement, as he had promised them he would the day before, and to continue the discussion of BAC's interest in Brookfield. There, after examining the agreement, counsel for Bankers Trust inquired whether the $250,000 loan had been deposited by the required date of August 23. When Braten replied that it had not been, the attorney told Braten that it was his belief that BAC must have already forfeited its interest in Brookfield. Braten, purportedly secretly surprised by the news, returned to Feldesman, who not only confirmed the assessment given at Bankers Trust but also announced that, as of August 24, all twenty of BAC's shares had been transferred to the Soifer Trust.

---

1. It appeared that for the ten months preceding July 31, 1974, BAC had sustained a pre-tax loss of $2.7 million and achieved a net worth of negative $420,000.

2. The shareholders' agreement was between BAC, Brookfield, and Pearl Soifer (Soifer's wife) as Trustee for the Soifer Trust. When the trust was later terminated in January of 1976 at Soifer's direction, the Brookfield shares were put in his name.

Whether Braten and Soifer expected this result at the time became a much disputed issue later at the trial. On the one hand, there is, first, Braten's testimony that he was surprised by the news of the forfeiture because he had thought that his personal guarantee made on August 13 was the equivalent of the loan to Brookfield called for in the agreement, and, second, Soifer's testimony that he did not ask Braten for the loan until August 26, which suggests that he did not then think of himself as the sole owner of the new company. On the other hand, for two people who were supposedly surprised by the sudden shift of 50% of their new company's ownership, Braten and Soifer would have had to have been preoccupied in the extreme to have been, as they testified, "too busy" to discuss the transfer once they learned about it.

In any case, following BAC's filing for bankruptcy, the shareholders' agreement was examined by various interested creditors and attorneys, all of whom concluded that it had been genuinely entered into and that BAC had thus lost its interest in Brookfield. Thereafter, Feldesman, as attorney for Soifer, offered BAC the opportunity to reacquire the shares on two conditions: first, that its creditors advance Brookfield the $250,000 that Braten had promised; and second, that Soifer be indemnified on his personal guarantee to Chase. This offer was not accepted by the creditors, to whom, it should be noted, Braten never revealed either his similar personal guarantee of $250,000 or his purported surprise, or disbelief, that BAC had lost its interest in Brookfield.

As the Chapter 11 proceedings continued, they became extremely litigious. New lawyers entered the picture and several lawsuits were commenced among the various interested parties.[3] During these prolonged proceedings, Feldesman made one final appearance and attempted to negotiate a "global settlement." Although he initially testified that he reentered the scene at the request of Braten's father-in-law, who was a long-time friend, Feldesman later stated that he had both the father-in-law's and Soifer's interests in mind. Soifer, however, claimed that he had not been aware of Feldesman's activities on behalf of Brookfield in the Chapter 11 proceedings and that any such activities were unauthorized. The "global settlement," in any case, was never consummated.[4]

In July of 1975, BAC filed a proposed plan of arrangement, which was later amended because of the collateral litigations. Approved by the creditors in September of 1975, the amended plan made no mention of Brookfield and allowed each creditor only 15% of its claim. Several months later, on March 12, 1976, this approved plan was confirmed by Judge Babitt. In the meantime, the question of BAC's interest in Brookfield (which by then was quite profitable) had resurfaced. Soifer and Braten were considering consolidating the two companies, but they disagreed with Feldesman about how it should be done. The former two wanted Soifer simply to acknowledge publicly that BAC had owned Brookfield from the beginning, while Feldesman wanted Soifer to discover or concoct a valid business purpose for agreeing that BAC had always had such an ownership interest. Feldesman even went so far as to suggest a "litigation" in which BAC's ownership of Brookfield would be secretly agreed to in advance but publicly stipulated to in a settlement only after the impression of significant disagreement had been created through the adversarial proceedings. That such creativity was put into the search for a workable scheme shows just how strongly committed were all three men to the goal of consolidating BAC and Brookfield. In the end, that consolidation was achieved in August of 1976 with a

---

**3.** See, e.g., Bankers Trust Company v. Braten, 101 Misc.2d 227, 420 N.Y.S.2d 584 (Sup.Ct. 1979); In re Braten Apparel Corp., No. 74–B–1256 (Bkrtcy.S.D.N.Y. April 29, 1981).

**4.** If such a settlement had been consummated, the claims of Bankers Trust would have been assigned, which might have prevented it from seeking in this action revocation of the plan which Judge Babitt confirmed. See 9 Collier on Bankruptcy ¶ 11.02[1], at 645–47 (14th ed. 1978).

minimum of fanfare. Soifer and Braten merely shook hands, and Soifer turned over all the Brookfield shares to BAC and acknowledged that BAC had owned Brookfield from its inception. On August 24, 1976, Soifer made his position known to the public by informing Brookfield's independent auditors that it had been owned by BAC since August 1974. Two months later, Soifer agreed to buy from Braten 45% of BAC's outstanding stock at a price that was to be determined by an independent appraiser at some undisclosed date in the future.

In the view of Bankers Trust, this consolidation of companies and transfer of Brookfield shares actually constituted the consummation of a "secret trust," requiring Soifer to restore Brookfield to BAC after the confirmation of its Chapter 11 plan. The bank argues that the existence of such a "secret trust" convincingly explains, as none of the defendants' stories do, why Soifer would have turned over all of the stock of the tremendously profitable Brookfield and consolidated it with a company just coming out of bankruptcy.[5]

Based upon these facts, Judge Babitt found that Bankers Trust had sustained its burden of proving that it had been induced by fraudulent means into approving the arrangement. The key to BAC's fraud, he held, was the shareholders' agreement, by which BAC sought to protect its newly acquired interest in Brookfield by apparently relinquishing that interest to Soifer while actually insuring that it would be restored as soon as the Chapter 11 proceedings were completed. Judge Babitt also found that the concealment was furthered by false and misleading information supplied to the creditors and the court throughout the Chapter 11 proceedings.

In reaching these conclusions, Judge Babitt observed that the intent to defraud is rarely provable directly and so must be inferred from the evidence. He stressed that the evidence in this case established that the shareholders' agreement was executed at a time when the interested parties knew that BAC could not possibly supply the $250,000 subordinated loan mandated by the agreement, so that the only real function the condition could have served was to shield the Brookfield asset from BAC's creditors. Judge Babitt also concluded that Feldesman had been brought into the picture to structure the shareholders' agreement and that the claim that he had represented only Soifer's interests was not credible. In the words of the opinion below:

> The only reasonable explanation for Feldesman's sudden appearance on the scene is his scenario for a plan to protect Brookfield.
>
> The shareholders' agreement was clearly a last minute attempt to save Brookfield from BAC's creditors.

*In re Braten Apparel Corp.,* 21 B.R. 239 at 257 (Bkrtcy.S.D.N.Y.1982).

Moreover, Soifer's testimony as to how he was protected by the shareholders' agreement also rings false. As Judge Babitt said below, the "explanation defies logic and common sense. It is impossible to believe that Soifer, a sophisticated and successful man, would simply hand back a company as successful as Brookfield for an employment agreement and the privilege of purchasing a minority stock interest in BAC at an undetermined fair market value." *Id.* at 258.[6] The court concluded, therefore, that fraud had been practiced in the procurement of the approval and confirmation of BAC's Chapter 11 plan.[7]

---

**5.** Certainly, Soifer's claim of having gotten everything that he wanted from Brookfield and being willing therefore to "capitulate," or give it away, is hardly a credible explanation of why he relinquished the ownership of a company doing almost $18 million a year in sales with a net pre-tax profit of $1.5 million a year (or almost ten percent of sales, which is considered extraordinary in the garment industry).

**6.** Most likely, it was just this fantastical air about Soifer's story that had prompted Feldesman to search desperately for a more credible justification for the final transfer of shares.

**7.** Another issue litigated below was whether the creditors such as Bankers Trust had actual or constructive knowledge of the fraud before BAC obtained approval and confirmation of the plan. This issue has not been pursued on appeal. Even if it had been, this Court would

## DISCUSSION

■ Appellant acknowledges, as it must, that Rule 810 of the Rules of Bankruptcy Procedure controls the review of this case. That rule provides:

> Upon an appeal the district court may affirm, modify, or reverse a referee's judgment or order, or remand with instructions for further proceedings. The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge of the credibility of the witnesses.

Bankr.P. Rule 810, 11 U.S.C. Appendix (1976); *see also In re Fabric Tree, Inc.,* 558 F.2d 1069, 1072 (2d Cir.1977); *In re Ira Haupt & Co.,* 424 F.2d 722, 723 (2d Cir. 1970); *In re Penn Dixie Industries, Inc.,* 9 B.R. 936, 938 (D.C.S.D.N.Y.1981) ("district court cannot set aside the findings of fact of a bankruptcy judge unless 'clearly erroneous'"). As the last part of Rule 810 suggests, there is a strong presumption in favor of the bankruptcy judge's findings of fact where they are supported by substantial evidence. *Cf. Slodov v. United States,* 552 F.2d 159, 162 (6th Cir.1977) ("findings of fact of a Referee in Bankruptcy (now Bankruptcy Judge) should not be disturbed by a district judge unless there is 'most cogent evidence of mistake or miscarriage of justice'"), *rev'd on other grounds,* 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978), *cited with approval in Penn Dixie, supra,* 9 B.R. at 938.

This is a case in which deference to the bankruptcy judge is especially advisable. The very fraud which serves as the basis for reopening the confirmation plan, that is the false declarations that BAC made to obtain approval, occurred for the most part in hearings conducted in the presence of Judge Babitt. At that point, he accepted the representations on their face. After the subsequent developments, and following a full trial in 1981 and 1982, he concluded that what he had heard and seen when he confirmed the approved plan constituted fraud. In arriving at this conclusion, he had to reconcile many differing statements of the interested witnesses and attempt, in analyzing them, to conclude where the truth lay. The coincidence of all of the essential transactions resulting in the original purported transfer of ownership and the crumbling of BAC's financial position was, to say the least, suspicious. The retransfer of ownership following the confirmation does not appear to be, as appellant argues, post hoc reasoning. Rather, it substantially confirms the suspicion that BAC had intended from the outset to defraud its creditors.

■ There is little that precedence or reported cases can do to assist a trier of fact in determining whether fraud has occurred. *In re Saphire,* 139 F.2d 34, 35 (2d Cir.1943). Because fraud is rarely susceptible of direct proof, it is usually established by circumstantial evidence and legitimate inferences arising therefrom. The inferences in turn depend upon the application of common sense to the circumstances present. *Connolly v. Gishwiller,* 162 F.2d 428, 433 (7th Cir.), *cert. denied,* 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947).[8] Because Judge Babitt's finding of fraud was supported not only by the strong circumstantial evidence described above, but also by his observation of the demeanor and credibility of the numerous witnesses who gave conflicting testimony, this Court is compelled to conclude that his finding was correct. Certainly, it was not "clearly erroneous."[9]

have had to agree with Judge Babitt's conclusion that, although there may have been some cause for suspicion, Bankers Trust had neither actual nor constructive knowledge of the fraud before the plan was confirmed.

8. Appellant's reliance upon *H.L. Moore Drug Exchange v. Eli Lilly & Co.,* 662 F.2d 935, 941 (2d Cir.1981) for the proposition that courts have established specific "guidelines" for determining the legitimacy of a judge's inferential reasoning is simply misplaced. The "guidelines" discussed in that case have been developed solely for the narrow purpose of determining the very technical issue of whether a "conspiracy," as that term is used in the Sherman Antitrust Act, may be inferred from a given set of facts. Those guidelines were never intended to have general application in other areas of the law, such as common law fraud.

9. In light of this conclusion, the Court need not consider appellee's alternative argument—that BAC's false declarations by themselves constitute sufficient grounds for revoking the confirmed plan.

Having found no problems with the findings of fact, we are left with appellant's one objection to Judge Babitt's "conclusions of law." BAC contends that there was no proof that Brookfield had any value when its shares were transferred in August of 1974 and no proof that before that transfer occurred BAC was the sole owner of Brookfield. The first aspect of this contention, that concerning the value of Brookfield, is clearly a factual issue and one that Judge Babitt correctly decided in favor of Bankers Trust. Although it is true that one witness testified that Brookfield was worthless and written off by everyone in August of 1974, there was much more evidence to the contrary. Moreover, the perpetrators of this fraud move well beyond the pale by arguing that the treasured object of all their secret planning and elaborate scheming had no economic value. Finally, even if the asset were worth little or nothing, its lack of value would not excuse BAC from its obligation as debtor to list the asset in its original petition; for, "the creditors should not be forced to search out the true state of affairs." *In re Mazzola,* 4 B.R. 179, 183 (Bkrtcy.D.Mass.1980).

As for the second part of BAC's contention, i.e., that BAC never was the sole owner of Brookfield, the Court finds appellant's reasoning to be both convoluted and unpersuasive. At oral argument, counsel for BAC claimed that the court below erred in failing to make a determination of BAC's and Soifer's original respective ownership interests in Brookfield. BAC contends that if the shareholders' agreement is acknowledged as valid except for the transfer of the assets, then Soifer owns at least fifty percent of the company, and that even if the agreement is invalid, he has certain claims against the estate which entitle him to some remuneration. It appears to the Court, however, that the inferential finding of Judge Babitt was that the shareholders' agreement was, in its entirety, a sham, and that, as of the date of BAC's financial collapse, Soifer had no claim to an equity interest in Brookfield. That he may have had some claims against Braten, Brookfield, and BAC because of the position in which he then found himself is entirely immaterial here. Those were claims to be asserted by him as a creditor in BAC's reorganization proceedings.

Moreover, this Court can see no reason why Judge Babitt was required to determine the relative ownership interests of the parties. Once he found, as he clearly did, that BAC had *some* undisclosed ownership interest in Brookfield and that Brookfield had some value, a sufficient basis was established for concluding that there had been a fraudulent transfer sufficient to upset the approval and confirmation of the plan. Consequently, there was no error of law committed by the court below.

Thus, because the lengthy opinion of the court below appears correct in all respects, it is affirmed.

SO ORDERED.