**ACLI GOVERNMENT SECURITIES, INC., Plaintiff,**

v.

**Daniel RHOADES and Norma Rhoades, Defendants.**

**No. 83 Civ. 4778 (MEL).**

United States District Court, S.D. New York.

Feb. 17, 1987.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, of counsel: Daniel R. Lenihan, for plaintiff.

Rhoades and Rhoades, P.C., Brewster, N.Y., for defendants.

Daniel Rhoades, New York City, pro se.

LASKER, District Judge.

This case concerns the validity of a conveyance of property from defendant Daniel Rhoades to his sister defendant Norma Rhoades, which occurred the day before a judgment of over $1,500,000 was entered against Daniel Rhoades in favor of plaintiff ACLI Government Securities, Inc. ("AGS")

in *ACLI Government Securities, Inc. v. Rhoades,* 81 Civ. 2555 (MEL) ("the AGS securities action"). After hearing the testimony of six witnesses and examining a number of documents presented at a three-day non-jury trial, I conclude that the conveyance was fraudulent and that AGS is entitled to judgment accordingly.

The significant facts are not in dispute. AGS is a government securities trader. Daniel and Norma Rhoades, both New York State residents and attorneys licensed to practice in New York, are brother and sister who are also partners in the law firm of Rhoades & Rhoades. After a lengthy jury trial, on May 10, 1983 the jury in the AGS securities action returned a verdict in favor of AGS and against Mr. Rhoades in the amount of $1,285,598.28. On May 20, 1983, a judgment on the verdict against Mr. Rhoades was signed and it was filed three days later. After a technical amendment, the total judgment was for $1,519,898.59, of which $1,385,401.06 plus post-judgment interest remains outstanding and unpaid.[1]

On June 30, 1959, Daniel and Norma Rhoades became the owners of the property which is the subject of this suit, consisting of 68 acres of land located at Route 124 and Turk Hill Road in Brewster, Putnam County, New York ("the Putnam County Property"), as "tenants-in-common, Daniel Rhoades having an undivided three-fifths ... thereof ... and Norma Rhoades having an undivided two-fifths ... thereof." [2] In 1981–1982 a house was constructed on the property, and as of May, 1983, the property was appraised to have a value of $325,000.[3] On May 19, 1983, the day before the judgment against Daniel Rhoades referred to above was signed, defendants executed a deed in which Daniel and Norma Rhoades conveyed the Putnam County property to Norma Rhoades, for $1.00 and unspecified "other good consideration." [4]

■ While the parties agree on these facts, they strenuously debate the question at the heart of this action: whether the May 19, 1983 conveyance described above was fraudulent under N.Y. Debt. & Cred. Law §§ 270–81 (McKinney 1945 and Supp. 1987). AGS argues that the conveyance is fraudulent under (1) N.Y.Debt. & Cred.Law § 273–a (McKinney Supp.1987), because the conveyance was made without fair consideration by a defendant in a lawsuit who failed to satisfy a final judgment against him; (2) N.Y.Debt. & Cred.Law § 273 (McKinney 1945), because the conveyance was made without fair consideration and rendered Mr. Rhoades insolvent; and (3) N.Y.Debt. & Cred.Law § 276 (McKinney 1945), because the conveyance was made with actual intent to defraud AGS. Defendants contend that the conveyance of property was a valid transfer, grounded upon the consideration of an antecedent debt owed by Mr. Rhoades to Ms. Rhoades, that the conveyance did not render Daniel Rhoades insolvent and that it was not made with intent to defraud.[5]

1. Trial Transcript ("Tr.") at 23–24 (testimony of Paul Dziubek, executive vice-president of AGS); Plaintiff's Exhibit ("PX") 6 (AGS securities action judgment and amended judgment).

2. PX 7, p. 3. (June 30, 1959 warranty deed to Putnam County property).

3. Deposition of Norma Rhoades, 83 Civ. 4778 ("N.R.Dep. I") at 16–17, 90–91.

4. PX 8 (May 19, 1983 bargain and sale deed to Putnam County property). Although on December 15, 1982, an order was entered in the AGS securities action which directed Mr. Rhoades "not [to] engage (either directly or indirectly) in any transfer of assets which might cause a material change in his financial condition except upon five (5) days written notice to this Court and ACLI's counsel ....,'" PX 5 (Court Order, Dec. 15, 1982), Daniel Rhoades did not notify AGS' counsel or the court of this conveyance.

5. Defendants also argue that this court does not have diversity jurisdiction over them because AGS' principal place of business is in New York, and that AGS does not have standing to sue. As to jurisdiction, the uncontradicted testimony of Paul Dziubek, AGS' executive vice-president, established that at all relevant times AGS' principal place of business was in Illinois. Tr. at 18–22 (Dziubek testimony). Moreover, the Court of Appeals for this circuit held in an earlier, related case that AGS' principal place of business was Chicago, *see ACLI Government Securities Inc. v. Rhodes,* slip op., A3–7732 (2d Cir. March 9, 1984). As to AGS' standing to bring this suit, I conclude that the sale of AGS by Donaldson, Lufkin & Jenrette to Kleinwort Ben-

## I. § 273–a

Under § 273–a,

[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment ... has been docketed against him, is fraudulent ... without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

Defendants contend that the May 1983 conveyance was based on fair consideration because it was in satisfaction of an antecedent debt owed by Daniel Rhoades to Norma Rhoades. Ms. Rhoades testified at trial that she had entrusted her brother with half a million dollars in treasury bonds so that he could convert them from 4.25 percent to 9 percent treasury bonds via his AGS account, and that the bonds were never returned to her.[6] The only proof offered of this transaction was evidence that Norma Rhoades owned $40,000 of over $350,000 in treasury bonds that Daniel Rhoades had forwarded to his AGS account in August-September 1980.[7]

█ The burden of proof to establish that a debtor's conveyance was made without fair consideration is on the creditor. However, where the evidentiary facts as to the nature and value of the consideration are within the transferee's control, the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee. *See Gelbard v. Esses*, 96 A.D.2d 573, 465 N.Y.S.2d 264, 268 (2d Dept. 1983). Moreover, in an intrafamily transaction there is a heavier burden on the transferee to establish fair consideration for the transfer. *See Orbach v. Pappa*, 482 F.Supp. 117, 119 (S.D.N.Y.1979).

█ I find that the May 19, 1983 conveyance of property was not based on fair consideration. While an antecedent debt may provide fair consideration for a conveyance of property, it must be "in amount not disproportionately small as compared with the value of the property ... obtained." N.Y.Debt & Cred.Law § 272(b) (McKinney 1945). The evidence here was not sufficient to establish the existence of *any* antecedent debt, let alone a debt proportionate to Mr. Rhoades' interest in the Putnam County property. First, while on deposition Ms. Rhoades stated that she "loaned" bonds to her brother, at trial she testified that she "entrusted them" to her brother "[t]o return to [her] 9 percent Treasury Bonds for an equivalent amount."[8] Ms. Rhoades' trial testimony, then, suggests the conclusion that the transaction between her and her brother, if any, was a bailment rather than a loan. Furthermore, even if Norma Rhoades did make bonds available to her brother, this would not necessarily have created a creditor-debtor relationship between them. The evidence presented supported the conclusion that defendants' joint partnership and individual personal financial accounts were inextricably mixed: Norma Rhoades stated in her deposition that she and her brother have never balanced their financial accounts,[9] and Daniel Rhoades testified that there has never been an accounting as to their law partnership.[10] The fact that defendants' finances have been commingled for so long makes it impossible to conclude, on the

---

son Limited has not deprived AGS of standing to sue, since AGS is still the owner of the judgment against Rhoades and is obliged to pursue collection. *See* Tr. at 48–55 (Dziubek testimony), 153–163 (testimony of Jeffrey Belitz, chief financial officer, Kleinworth Benson Holdings).

**6.** Tr. at 126–27, 132 (testimony of Norma Rhoades).

**7.** Defendant Norma Rhoades' Exhibits ("N.R.X") A and B (records of bond receipts). Ms. Rhoades did not testify as to the exact date of this transaction.

**8.** *Compare* N.R.Dep. I at 88 *with* Tr. at 127–28 (testimony of Norma Rhoades).

**9.** N.R.Dep. I. at 87.

**10.** Tr. at 169–170 (Daniel Rhoades testimony). Mr. Rhoades testified on deposition that "[i]t's a case of each partner taking whatever they require at the moment or want at the moment." Deposition of Daniel Rhoades, 81 Civ. 2555 ("D.R.Dep.") at 46.

evidence presented, that Daniel Rhoades was in debt to Norma Rhoades. Finally, Daniel Rhoades' own statements and those of his counsel further support the conclusion that he was not in debt to his sister at the time of the conveyance. In December 1982, Mr. Rhoades' then-attorney represented that he was unaware of any significant liabilities faced by Mr. Rhoades, and Mr. Rhoades himself swore out an affidavit on the issue of his financial condition which failed to mention any debt owed to Norma Rhoades.[11]

In addition, Ms. Rhoades' testimony was contradictory and inconclusive on the size of the alleged antecedent debt. In her deposition, she testified that Mr. Rhoades owed her over two million dollars,[12] while at trial she only testified about a $500,000 transaction, and the documentary evidence suggested only that $40,000 of the $350,000 in treasury bonds which were forwarded to Daniel Rhoades' AGS account could have belonged to Ms. Rhoades.[13] Ms. Rhoades also testified variously that the bonds allegedly entrusted to Mr. Rhoades were (1) assets of the Rhoades & Rhoades partnership, in which bonds she held a 40% interest;[14] (2) assets from her personal savings account;[15] and (3) a combination of Rhoades & Rhoades assets and personal assets.[16]

In sum, the evidence presented on the transfer of bonds from Norma to Daniel Rhoades established at most a bailment of indeterminate size, and I conclude that there was no antecedent debt owed by Daniel Rhoades to Norma Rhoades which could have served as fair consideration for the conveyance of property in question.

■ To establish the fraudulence of a conveyance under § 273–a it must also be

shown that the defendant has failed to satisfy the judgment. It is undisputed that AGS's judgment is still unsatisfied. However, defendants argue that AGS itself prevented satisfaction of the judgment by seeking and obtaining an order freezing the assets in the so-called "Kingsgate" account at Advest, Inc., "which prevented Daniel from using the Kingsgate account to pay the judgment, although he could have done so."[17] This argument is without merit. In the first place, at the time the May 1983 judgment was entered, Daniel Rhoades denied having any ownership interest in the account at Advest and forced AGS to litigate the issue. Hence Mr. Rhoades cannot now blame AGS for failing to satisfy the judgment against him out of that account. Second, by the end of 1983, while the issue of ownership was still in litigation, the net equity value in the account was only $152,113,[18] so that even if Mr. Rhoades had been able to liquidate the account and apply the proceeds to the judgment, the judgment still would not have been satisfied.

In conclusion, I find that AGS has established that the conveyance was fraudulent under § 273–a.

## II. § 273

■ § 273 provides that:

[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made ... without a fair consideration.

N.Y.Debt. & Cred.Law § 273 (McKinney 1945). It has already been concluded that the Rhoades conveyance was made without fair consideration, so that if it is found that the conveyance rendered Daniel Rhoades

---

11. PX 3, pp. 20–21, and PX 4 (transcript of proceedings before Judge Morris E. Lasker, Dec. 6, 1982, and Affidavit of Daniel Rhoades, Dec. 8, 1982).

12. N.R.Dep. at 44, 51.

13. N.R.X. A and B (records of bond receipts).

14. N.R.Dep. I at 45.

15. Tr. at 126–27 (Norma Rhoades testimony).

16. N.R.Dep. I at 46.

17. Defendants' Joint Post-Trial Memorandum, p. 5.

18. PX 12 (Advest, Inc., Statement of Account of Kingsgate Associates).

insolvent within the meaning of the statute, the conveyance is fraudulent under § 273.

Under New York law,

[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and mature.

N.Y.Debt. & Cred.Law § 271(1) (McKinney 1945). When a transfer is made without consideration, the burden of going forward with proof of solvency is on the defendants. *See In re O.P.M. Leasing Services, Inc.*, 40 B.R. 380, 392 (Bankr.S.D.N.Y.), *aff'd*, 44 B.R. 1023 (S.D.N.Y.1984), *aff'd*, 769 F.2d 911 (2d Cir.1985); *In re Tabala*, 11 B.R. 405, 408 (Bankr.S.D.N.Y.1981). I conclude that Daniel Rhoades was insolvent at the time of the May 1983 conveyance.

At trial, Daniel Rhoades offered evidence of three assets which he claimed to have owned at the time of the conveyance, the aggregate value of which (without including the Putnam County property) was allegedly sufficient to satisfy AGS' judgment of $1,519,899. The three assets were real property in South Carolina, a securities account at Advest, Inc., and an account receivable of Rhoades & Rhoades.[19]

### a) *The South Carolina Property*

Daniel Rhoades testified at trial that at the time the May 1983 judgment was entered against him, he was the owner of real property in Anderson County, South Carolina.[20] Karl Kenyon, a South Carolina lawyer who also invests in real estate in Anderson County, testified for Mr. Rhoades that in his opinion the property,

which consisted of about 425 acres of undeveloped land, could have been sold as "ranchette" sites for a net of approximately $700,000.[21] However, Kenyon's opinion was undercut in several ways. First, the South Carolina property was actually sold in 1984 or 1985 at auction for only about $200,000,[22] and the actual price which the property brought on the open market is far better evidence of its value than Kenyon's speculation as to what price the land might have brought had it been marketed in a particular way. Second, the only appraisal of the property which was put into evidence was an estimate made in 1983 by a South Carolina real estate broker that the property was worth approximately $475–$500 per acre, or about $212,500 in all.[23] Finally, Kenyon's limited experience in the real estate field—which is not his profession—and his business relationship and friendship with Daniel Rhoades,[24] weaken the value of his opinion. I find that the South Carolina property had a value of approximately $212,500 in 1983.

### (b) *The Advest Account*

At trial, Daniel Rhoades testified that the Kingsgate partnership account at Advest, Inc., was one of the assets which established his solvency at the time of the 1983 Putnam County property conveyance.[25] As discussed in Part I of this opinion, however, Mr. Rhoades originally denied ownership of the Kingsgate account at the time judgment was entered against him, and by the time his ownership interest had been established by litigation, the account had been substantially depleted. Furthermore, it is unclear whether Mr.

---

**19.** Daniel Rhoades also testified at trial that he owned several other assets at the time of judgment, including an interest in the New South Bronx Venture. However, he testified on deposition that he received no compensation from his investment in that venture, D.R.Dep. at 25. After trial, AGS submitted tax returns for the partnership which show losses to Rhoades of $500,000 in 1979–81, ACLI Government Securities, Inc'.s Post-Trial Memorandum, Exhibit A, the same amount which Mr. Rhoades claims to have invested in the company, Tr. at 176 (Daniel Rhoades testimony). Mr. Rhoades has not contested the accuracy of the returns.

**20.** Tr. at 173–74 (Daniel Rhoades testimony).

**21.** Tr. at 78, 87, 92–93 (testimony of Karl Kenyon).

**22.** *Id.* at 94–95.

**23.** PX 10 (November 9, 1983 letter from Hugh Durham, President, Durham-Meehan Company, Inc.).

**24.** *See* Tr. at 86–87 (Kenyon testimony).

**25.** *See* Part I, *supra*.

Rhoades' interest in the account ever had a "fair, salable value," as required by N.Y. Debt. & Cred.Law § 271(1), since Mr. Rhoades had only an indirect partnership interest in the account.[26]

### (c) Rhoades & Rhoades Accounts Receivable

Daniel Rhoades testified on deposition that Braten Apparel Corporation ("BAC") owed Rhoades & Rhoades approximately $3 million in May 1983.[27] However, in May 1983 BAC was bankrupt, *see In re Braten Apparel Corp.*, 21 B.R. 239 (Bankr.S.D.N.Y.1982), *aff'd* 26 B.R. 1009 (S.D.N.Y.), *aff'd without opinion*, 742 F.2d 1435 (2d Cir. 1983). Hence Rhoades & Rhoades' claim against BAC was too contingent and uncertain to have been salable and hence cannot be counted an asset which would have rendered Daniel Rhoades solvent in May 1983. *See Glenmore Distilleries Company v. Seideman*, 267 F.Supp. 915, 918 (E.D. N.Y.1967); *Farm Stores, Inc. v. School Feeding Corp.*, 102 A.D.2d 249, 253, 477 N.Y.S.2d 374, 378 (2d Dept.1984), *aff'd*, 64 N.Y.2d 1065, 489 N.Y.S.2d 877, 479 N.E.2d 222 (1985). Moreover, it is unclear whether Daniel Rhoades could have benefitted from collection of the BAC account receivable, had collection been possible. Norma Rhoades testified on deposition in September, 1983 that Mr. Rhoades was indebted to the partnership and that nothing was due him from Rhoades & Rhoades.[28] The evidence did not establish that Mr. Rhoades could claim any Rhoades & Rhoades accounts receivable as personal assets in May, 1983.[29]

In sum, I find Daniel Rhoades' testimony on his alleged solvency as of May 19, 1983 to be incredible in critical part, and conclude that defendants have failed to establish that at the time Daniel Rhoades transferred the Putnam County property to his sister he had assets whose aggregate fair, salable value was equivalent to the judgment about to be entered against him of $1,519,899. Hence, the conveyance was fraudulent under § 273.

### III. § 276

Under § 276,

[e]very conveyance made ... with actual intent ... to hinder, delay, or defraud either present or future creditors, is fraudulent....

N.Y.Debt. & Cred.Law § 276 (McKinney 1945). The burden of proof to establish "actual intent" is on the creditor who seeks to set aside the conveyance, and he must do so by clear and convincing evidence. *See Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 508 N.Y.S.2d 17, 20 (2d Dept. 1986).

Actual fraudulent intent, by its very nature, is rarely susceptible to direct proof, and normally is established by inference from the circumstances surrounding the allegedly fraudulent act. *See Murkoff*, 508 N.Y.S.2d at 21. Factors from which fraudulent intent can be inferred include (1) a close relationship among the parties to the transaction; (2) secrecy and haste of the sale; (3) inadequacy of consideration; and (4) the transferor's knowledge of the creditor's claim and his own inability to pay it. *See In re Grand Jury Duces Tecum*, 731 F.2d 1032, 1041 (2d Cir.1984); *United States v. 58th Street Plaza Theater, Inc.*, 287 F.Supp. 475, 498 (S.D.N.Y.1968); *DeWest Realty Corp. v. I.R.S. of United States*, 418 F.Supp. 1274, 1279 (S.D.N.Y.1976). In this case, I find and conclude that the conveyance of the Putnam County property was made by Daniel Rhoades with actual

26. *See* Report and Recommendation of Mag. Bernikow, March 28, 1986.

27. D.R. Dep. at 53, 60–67, 332–33.

28. Deposition of Norma Rhoades, 81 Civ. 2555 ("N.R. Dep. II") at 6–8.

29. At trial no evidence was presented as to the BAC account receivable, but Mr. Rhoades testified that "[i]f Rhoades & Rhoades was Daniel Rhoades, then Daniel Rhoades had about $200,000 of goods receivable" owed to him at the time of the conveyance, Tr. at 176. However, no documentary evidence was offered to support this claim, nor was it explained why Mr. Rhoades would be entitled to money owed to the law partnership.

intent to defraud AGS, and that Norma Rhoades knew of his intent.

This case has all of the classic indicia of fraudulent intent. Intrafamily transfers are scrutinized carefully, *see Murkoff*, 508 N.Y.S.2d at 22, and Daniel and Norma Rhoades are not only brother and sister but have been law partners together for almost forty years.[30] Both defendants knew of the jury verdict against Daniel Rhoades at the time of the conveyance. Indeed, Norma Rhoades testified on deposition that she demanded that her brother turn over his interest in the property to her precisely because she was angry "that a verdict had been rendered in this matter, an unconscionable verdict, which was full of error," and she was concerned that "a sheriff should not come up and try to sell this interest improperly."[31] Second, the conveyance was made in secret, and was contrary to the court order of December 15, 1982 which required Daniel Rhoades to notify counsel and the court before transferring any assets. Moreover, the timing of the transaction, which occurred nine days after the jury verdict against Mr. Rhoades was announced and one day before judgment was signed against him, could not more strongly support the finding of fraudulent intent. Finally to be noted are the inadequacy of consideration involved and Daniel Rhoades' knowledge of his inability to pay the judgment, as discussed in Parts I and II.[32]

In sum, I conclude that AGS has established by clear and convincing evidence that the defendants' joint intent in conveying Daniel Rhoades' interest in the Putnam County property to Norma Rhoades was to defraud AGS, and that the conveyance was fraudulent under N.Y.Debt. & Cred.Law § 276.

## IV. *Equitable Lien*

Norma Rhoades claims that if the conveyance is declared fraudulent she is nevertheless entitled to an equitable lien on the property in the amount of the property taxes, maintenance and utility bills she has paid since the conveyance took place. The principal case on which she relies, *Vinlis Construction Co. v. Roreck*, 67 Misc.2d 942, 325 N.Y.S.2d 457, 464 (Sup.Ct. Nassau Co. 1971), *aff'd*, 43 A.D.2d 911, 351 N.Y.S.2d 648 (2d Dept.) *appeal dism'd in part and den'd in part*, 35 N.Y.2d 715, 361 N.Y.S.2d 645 (1974) and the cases cited in it do not support so broad a proposition. Even if Ms. Rhoades were entitled, despite her participation in the fraud, to an equitable lien on the property, a conclusion which is far from obvious, *see Hickland v. Hickland*, 100 A.D.2d 643, 645, 472 N.Y.S.2d 951, 953–54 (3d Dept.1984) (co-tenant who participated in fraudulent conveyance was barred from asserting equitable lien by "clean hands" doctrine), she would be entitled only to reimbursement for expenses essential to the preservation of the property and for tax payments beyond the reasonable value of her use and occupation of the land, *see Grosch v. Kessler*, 256 N.Y. 477, 478–79, 177 N.E. 10, 11 (1931). Here, there is no evidence that the $50,000 paid by Norma Rhoades in taxes for the Putnam County property for the years 1983 through 1987[33] exceeds the fair rental value of the estate for four years, nor that payment of the other bills was essential for the preservation of the property.

For these reasons, I find that Norma Rhoades had no right to an equitable lien on the Putnam County property. She retains, of course, her forty percent interest in the property as a tenant in common.

\* \* \*

In conclusion, the conveyance of Daniel Rhoades' interest in the Putnam County

**30.** Tr. at 124 (Norma Rhoades testimony).

**31.** N.R. Dep. I at 97.

**32.** In fact, if other circumstances warrant a finding of fraudulent intent, the conveyance may be found fraudulent even if it was based on

fair consideration, *see DeWest*, 418 F.Supp. at 1279, or if the debtor remained solvent after the conveyance, *see Elliott v. Elliott*, 365 F.Supp. 450, 454 (S.D.N.Y.1973).

**33.** N.R.X C (photocopies of tax payments).

property to his sister Norma Rhoades was fraudulent under N.Y.Debt. & Cred.Law §§ 273–a, 273 and 276. This Memorandum constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure. Accordingly, for the reasons expressed above, the plaintiff is entitled to judgment.

Submit proposed judgment upon notice.