30 F.3d 310
 74 A.F.T.R.2d 94-5408, 94-2 USTC P 50,363,
Unempl.Ins.Rep. (CCH) P 14081B
 UNITED STATES of America, Appellee-Cross-Appellant,
v.
Kelly M. McCOMBS, Robert J. McCombs, Nancy Ellison, Mary
McCombs, Defendants-Appellants-Cross-Appellees,
Jon Ellison, Columbia Savings & Loan Association, State of
New York, Defendants.
 Nos. 478, 479, Dockets 93-6122, 93-6144.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 21, 1993.
Decided July 13, 1994.
 
 Arnold R. Petralia, Rochester, NY (Petralia, Webb & O'Connell, of counsel), for appellants.
 Marion E.M. Erickson, Tax Div., Dept. of Justice, Washington, DC (Patrick H. Nemoyer, U.S. Atty., W.D. of New York, Rochester, NY, Michael L. Paup, Acting Asst. Atty. Gen., Gary R. Allen, Ann B. Durney, Tax Div., Dept. of Justice, Washington, DC, of counsel), for appellee.
 Before: MESKILL, MAHONEY and WALKER, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Western District of New York, Fisher, M.J., imposing liability for unpaid withholding taxes under 26 U.S.C. Sec. 6672 on defendant-appellant Nancy McCombs-Ellison (Nancy), finding federal tax liens on Nancy's former property prior to the interests of defendants-appellants Kelly McCombs (Kelly), Mary McCombs (Mary), and Robert McCombs (Robert), and ordering that property foreclosed by sale pursuant to the tax liens. See United States v. McCombs-Ellison, 826 F.Supp. 1479 (W.D.N.Y.1993). For the reasons stated below, we affirm the part of the judgment imposing taxpayer liability on Nancy under 26 U.S.C. Sec. 6672 and upholding the validity of the 1982 federal tax lien thereunder; we vacate the judgment as to the setting aside of the conveyance of the property from Nancy to Mary and Kelly as fraudulent under N.Y. Debtor & Creditor Law Secs. 273 and 276 and the foreclosing of the 1982 and 1984 tax liens and remand for further proceedings consistent with this opinion; and we reverse the judgment determining that the federal tax liens are prior to the interests of Robert in the property.
 
 BACKGROUND
 
 2
 In 1962, Robert and Nancy purchased property at 74 Meadow Creek Lane (Property) in Monroe County, New York. Nancy and Robert, who were legally married at the time, financed the Property by giving a $30,000 mortgage to Columbia Banking, Savings and Loan Association (Columbia Bank). After Nancy and Robert divorced, Robert conveyed his interest in the Property to Nancy by quitclaim deed dated May 5, 1978.
 
 
 3
 In 1979, Nancy entered into a restaurant business venture with Jon Ellison (Ellison). Ellison and Nancy incorporated Spinnaker Pole Corporation (Spinnaker Pole) with Nancy as president. In addition, Ellison and Nancy formed another business entity entitled The Port and Starboard (P & S). Nancy controlled 60 percent of both entities while Ellison owned the remaining 40 percent.
 
 
 4
 On May 14, 1979, Nancy and Ellison, through P & S, purchased the Edgewater Restaurant (Restaurant) for $235,000 from its owners (hereinafter referred to as the "sellers"). Under the terms of the purchase agreement, Nancy made a $50,000 down payment on the Restaurant and the balance of the purchase was then financed through a purchase money mortgage given to the sellers. Nancy obtained the down payment by granting Marine Midland Bank (Marine Midland) a second mortgage on her Property at Meadow Creek Lane. In turn, P & S leased the Restaurant to Spinnaker Pole in consideration of monthly rental payments of $2,724.75.
 
 
 5
 The Restaurant struggled. Eventually, P & S was unable to make its monthly mortgage payments to the sellers. On April 10, 1981, the sellers filed a foreclosure action. On April 24, 1981, P & S filed for Chapter 11 bankruptcy protection. In September of that year, Spinnaker Pole also filed for bankruptcy.
 
 
 6
 Spinnaker Pole failed to pay withholding and unemployment taxes of the Restaurant employees for the period October 1, 1979 through September 30, 1981. On June 14, 1982, the Internal Revenue Service (IRS) assessed tax liability of $26,925.79 (1982 assessment) for the unpaid taxes against Nancy and Ellison pursuant to 26 U.S.C. Sec. 6672.
 
 
 7
 On September 15, 1982, eight days after an IRS agent allegedly left a "calling card" at her house, Nancy conveyed the Property at 74 Meadow Creek Lane to her daughters, Mary and Kelly, by warranty deed. The deed, which was recorded on September 16, 1982, provided that Kelly and Mary "hereby assume and agree to pay, as part of the consideration for this conveyance" the unpaid principal with interest on both the Columbia Bank and Marine Midland mortgages remaining on the Property. (emphasis added). At the time of the conveyance, the outstanding balances on the Columbia Bank and Marine Midland mortgages were $10,469.29 and $47,328.65, respectively.
 
 
 8
 On September 22, 1982, the government filed notice of and recorded in the Monroe County Clerk's Office a federal tax lien on the Property for the amount of unpaid taxes set forth in the 1982 assessment. On April 16, 1984, moreover, the IRS issued a second tax assessment pursuant to section 6672 imposing tax liability for $3,091.28 (1984 assessment) against Nancy and Ellison for additional unpaid withholding and unemployment taxes incurred by Spinnaker Pole from October 1, 1981 through June 30, 1982. Notice of a federal tax lien on the Property for liabilities arising from the 1984 assessment was filed and recorded on June 21, 1984 in the Monroe County Clerk's Office.
 
 
 9
 In November 1984, Kelly and Mary borrowed $53,000 from their father, Robert. In return, Kelly and Mary gave Robert a mortgage on the Property for the corresponding amount of $53,000 which was recorded on January 24, 1985. The daughters used the funds in part to pay off in full the outstanding balance of the second mortgage on the Property held by Marine Midland. As of July 10, 1985, moreover, the outstanding balance on the first mortgage held by Columbia Bank had been paid down by the daughters to approximately $6,000.
 
 
 10
 On November 24, 1987, the government filed this action against Nancy, Mary, Kelly and Robert (collectively "appellants"), as well as Ellison, Columbia Bank, and the State of New York seeking to reduce the federal tax liens to judgment and foreclose on the property. Specifically, the government sought a judgment (1) against Nancy, pursuant to section 6672 for 100 percent of the unpaid tax liability incurred by Spinnaker Pole, (2) setting aside the conveyance of the Property from Nancy to her daughters as fraudulent, and (3) ordering that the federal tax liens be foreclosed and that the property be sold free and clear of any interests held by any of the appellants.
 
 
 11
 The parties consented to try the case before a United States magistrate judge pursuant to 28 U.S.C. Sec. 636(c). At a trial presided over by Magistrate Judge Fisher, the government's case consisted of an opening statement and 23 pieces of documentary evidence. As to the theory of its case, the government argued in its opening statement:
 
 
 12
 The one final distinction that I would make, Your Honor, is that we attempt to foreclose our tax liens on two separate theories. The fraudulent conveyance theory really only applies to the second assessment, which was approximately a $3700 assessment in 1984.... With respect to the first assessment, which was in June of 1982 for approximately $27,000, we take the position, since that assessment preceded the conveyance, that our tax liens were on the property at the time of the conveyance.... * [N]o fraudulent conveyance theory is necessary to prevail on foreclosing our tax liens with respect to the first assessment. We only need to establish that the daughters, Mary and Kelly, were not bonafide purchasers under 26 U.S.C. 6323A [sic]. So it's pretty much the same elements of the fair consideration under the fraudulent conveyance analysis but the insolvency analysis does not apply in a straight foreclosure of tax lien theory.
 
 
 13
 (emphasis added).
 
 
 14
 Appellants, moreover, did not object to the admission of the government's documents into evidence, with one exception not relevant here, but instead reserved their right to impeach the validity of the documents' contents through cross-examination of the witnesses who prepared the documents. The magistrate judge, apparently also under the impression that the government would be calling witnesses, received 22 of the documents into evidence "subject to the testimony that may develop later at trial and any objections to admission developed by that testimony would have to be developed at the initiative of the person or the party that objects." Appellants, however, were unable to implement their strategy of impeaching the validity of the documents because, much to their surprise, as well as to the surprise of the court, the government called no witnesses and immediately rested its case-in-chief on the submission of the documents.
 
 
 15
 Following the close of the government's case, appellants immediately moved for summary judgment or in the alternative to dismiss the complaint on the ground that the government had failed to establish a prima facie case of tax liability against Nancy or the fraudulent conveyance claim. The magistrate judge reserved decision on those motions.
 
 
 16
 For their part, appellants called only one witness, Nancy. Nancy testified extensively about her involvement and responsibilities at Spinnaker Pole. At the conclusion of Nancy's testimony, appellants rested and renewed their claim that the government had failed to establish a prima facie case at trial on any of its claims and moved for a judgment as a matter of law. Again, the magistrate judge reserved decision, preferring that the parties file post-trial briefs.
 
 
 17
 Following the submission of memoranda and post-trial oral argument, the magistrate judge rendered a verdict in favor of the government ordering foreclosure of the liens at a judicial sale. In an opinion and order, see 826 F.Supp. 1479, the magistrate judge found that (1) Nancy was liable for unpaid taxes under section 6672, (2) the federal tax liens were prior to any of the interests held by appellants in the Property because the conveyance of the Property from Nancy to her daughters, although recorded prior to the recording of the 1982 federal tax lien, was, nevertheless, fraudulent under New York law and as such should be set aside, and (3) Robert was not entitled to recover his interest in the Property under any legal or equitable theory. This appeal followed.
 
 DISCUSSION
 
 18
 This appeal requires us to sort through a maze of issues governed by a hybrid of state and federal law. In its simplest terms, this appeal challenges a judgment of foreclosure by sale on property pursuant to federal tax liens arising out of an assessment against the former property owner for tax liability under section 6672. Appellants attack not only the finding of the underlying tax liability and validity of tax liens arising thereunder but also the district court's determination of the priority of the federal tax liens on the Property. The case is further complicated by the government's reliance on different theories of foreclosure with respect to each of the two tax liens at issue. Accordingly, we begin with the issue of liability itself under section 6672 and proceed from there to examine the myriad of other issues raised as becomes necessary.
 
 I. Standard of Review
 
 19
 As a preliminary matter, the scope of our review of a bench trial is governed by a number of competing considerations. While we review issues of law de novo, district court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Fed.R.Civ.P. 52(a); see also 9 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Sec. 2587 (1994 Supp.) (noting that the deference to be given to inferences drawn by a trial court from undisputed documentary evidence is now settled as clearly erroneous) (Wright & Miller). In a bench trial, however, "where the functions of fact-finding and exposition of law are performed by the same person, the line between the functions is not always distinct." American Soc'y of Composers, Authors and Publishers v. Showtime/The Movie Channel, 912 F.2d 563, 569 (2d Cir.1990). We are cognizant, moreover, of the continuing disagreement among the federal courts as to Rule 52(a)'s operation on those issues categorized as mixed questions of law and fact. See generally 9 Wright & Miller Sec. 2589 (and cases cited therein); but cf. American Soc'y, 912 F.2d at 569 n. 11 (preferring "to consider issues either as matters of fact or of law" and thus, to avoid "the unhelpful category of 'mixed question of law and fact' "). Suffice it to say, therefore, that the degree to which Rule 52(a) governs our review on this appeal is " '[a]n area over which "law" and "fact" have battled for over a century.' " In re Hygrade Envelope Corp., 366 F.2d 584, 588 (2d Cir.1966) (alteration in original) (quoting Ellerman Lines, Ltd. v. THE PRESIDENT HARDING, 288 F.2d 288, 292 (2d Cir.1961)).
 
 
 20
 In any event, our cases make clear that "the factual component of the issue before the [trial court in the context of a bench trial] does not render all aspects of [its] decision-making subject to review under the 'clearly erroneous' standard." American Soc'y, 912 F.2d at 569; see also United States Fidelity & Guar. Co. v. Royal Nat'l Bank, 545 F.2d 1330, 1333 (2d Cir.1976); In re Hygrade Envelope, 366 F.2d at 587-88. This is so because findings made in the context of a bench trial might be derived from legally impermissible factors, the failure to consider legally relevant factors, the application of incorrect legal standards, or the misapplication of correct legal standards. American Soc'y, 912 F.2d at 569. While it is certainly possible for these types of issues to arise in the context of a jury trial, "such matters are normally resolved by rulings on admissibility of evidence and by jury instructions." Id. Thus, "the degree of appellate abnegation toward the application of law to fact differs according to the identity of the fact finder." In re Hygrade Envelope, 366 F.2d at 588.
 
 
 21
 Finally, any review of a trial court's findings made in the context of a bench trial requires us to "comport with good sense and institutional allocations of power." Id. To that end, we "must respect findings of the trial judge as to what in fact happened and in addition ... give due weight to his superior opportunity to acquire the true feel of the case." Id. At the same time, "when the issue is [the trial court's] application of a legal standard to facts undisputed or reasonably found" our review is not limited by the clearly erroneous standard and we will not shy away from plenary review where, as here, we are concerned "that the result does not jibe with the applicable rule of law." Id.
 
 II. Taxpayer Liability Under Section 6672
 
 22
 We turn first to the finding of Nancy's tax liability under section 6672, the liability disputed by appellants but relied on by the government to encumber the Property.
 
 
 23
 Section 6672(a) provides, in pertinent part:
 
 
 24
 Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall ... be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.
 
 
 25
 26 U.S.C. Sec. 6672(a). The statute requires, therefore, that two elements be established before personal liability for unpaid withholding taxes attaches: "[F]irst, the individual must be a person responsible for the collection and payment of withholding taxes, i.e., he must have the authority to direct the payment of corporate funds; second, the individual's failure to comply with the statute must be willful." Hochstein v. United States, 900 F.2d 543, 546 (2d Cir.1990).
 
 
 26
 Appellants contend that the evidence at trial was insufficient to support a finding of liability under section 6672. Although they do not attack the assessment itself, they contend that the evidence was insufficient to support a finding that Nancy was a "responsible person" and/or that she acted "willfully" within the meaning of the statute. Specifically, they argue that Nancy's testimony at trial was sufficient to rebut the presumption of correctness accorded the government's prima facie case for section 6672 liability set forth in its tax assessment. Appellants insist, therefore, that, by virtue of Nancy's testimony at trial that she had no responsibility for paying Spinnaker Pole's employee withholding taxes and was unaware that those taxes had not been paid, the government should have been required, at the very least, to come forward with additional proof beyond the assessment itself to support its claim for tax liability.
 
 
 27
 In concluding that the government established liability under section 6672 against Nancy, the magistrate judge relied primarily on the evidentiary weight accorded the tax assessment itself. Applying the settled rule that a tax assessment is accorded a presumption of correctness, the court followed a plethora of case law which places the burden of production as well as the burden of persuasion on the individual assessed the tax to prove by a preponderance of the evidence that the assessment is incorrect. 826 F.Supp. at 1486. Because the magistrate judge found Nancy's testimony to be "incredible" on the issue of responsibility and supportive of the government's case on the issue of willfulness, the magistrate judge concluded that Nancy failed to carry her burden of persuasion on either of the elements underlying section 6672 liability. Id. at 1486-90. The magistrate judge determined, therefore, that the government was not required to go forward with evidence beyond the tax assessment itself to establish Nancy's liability for the unpaid taxes as a matter of law. We agree.
 
 A. Allocation of Burden of Proof
 
 28
 In general, a government tax assessment is entitled to a presumption of correctness. See United States v. Janis, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); Bull v. United States, 295 U.S. 247, 259-60, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). A taxpayer who wishes to challenge the validity of the assessment, moreover, "bears the burdens both of production and of persuasion." Ruth v. United States, 823 F.2d 1091, 1093 (7th Cir.1987) (citing Janis, 428 U.S. at 440, 96 S.Ct. at 3025); see also Psaty v. United States, 442 F.2d 1154, 1159-60 (3d Cir.1971).
 
 
 29
 In the context of section 6672, however, courts have extended the presumption of correctness not merely to the amount of the assessment itself but also to the existence of the two elements, responsibility and willfulness, that underlie the imposition of this type of tax liability. Hochstein, 900 F.2d at 546; see also Honey v. United States, 963 F.2d 1083, 1087 (8th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992); Ruth, 823 F.2d at 1093; Calderone v. United States, 799 F.2d 254, 258 (6th Cir.1986); Psaty, 442 F.2d at 1160.
 
 
 30
 In United States v. Lease, 346 F.2d 696, 701 (2d Cir.1965), we set forth the manner by which the presumption operates:
 
 
 31
 [O]verall, the Government has the burden of coming forward and persuading the trier that the taxpayer has or had a tax liability. If not challenged the assessment establishes that liability. A taxpayer's challenge must persuade the trier by a preponderance of the evidence that the assessment is erroneous. The Government then [once the taxpayer meets her burden] must still persuade the trier that on the basis of all the evidence there was tax liability--perhaps in a different amount than initially asserted--for which the taxpayer was responsible.
 
 
 32
 We recently simplified the operation of that presumption in the section 6672 context to one in which a taxpayer "bears the burden of proving by a preponderance of the evidence that one or both of these elements [willfulness and responsibility] [are] not present" in order to defeat tax liability under section 6672. Hochstein, 900 F.2d at 546 (emphasis added).
 
 
 33
 In allocating the risk of nonpersuasion to the taxpayer in a case governed by section 6672, we are cognizant that the government is the claimant in this litigation. Despite this fact, we, as well as our sister circuits, have uniformly rejected the temptation to allocate the risk of nonpersuasion to the government where its procedural posture is that of either a counter-claimant in litigation brought to settle liability under section 6672, see, e.g., Hochstein, 900 F.2d at 546; Ruth, 823 F.2d at 1093; Calderone, 799 F.2d at 258; Anderson v. United States, 561 F.2d 162, 165 (8th Cir.1977); Psaty, 442 F.2d at 1160; Lesser v. United States, 368 F.2d 306, 310 (2d Cir.1966) (in banc), or, as here, a pure claimant in a collection action predicated on section 6672 liability, see, e.g., Lease, 346 F.2d at 700. As we stated in Lease :
 
 
 34
 Had [the taxpayer] chosen to follow either of the more typical methods available for questioning his tax liability-- ... [such as a] suit for refund of asserted overpayments--he would clearly have been obliged to present evidence contradicting the Commissioner's view of his tax liability and thus tending to rebut the presumption of correctness attaching to the assessment. As a plaintiff ... he would also have had the burden of persuading the trier by a preponderance of the evidence that the deficiency was factually incorrect or that the amount paid exceeded the true tax liability. We can see no reason why the taxpayer should be in any better position when he takes advantage of none of the available procedures and rather waits until the Government has to resort to enforcing its lien before he attempts to cast doubt upon the underlying tax liability.
 
 
 35
 Lease, 346 F.2d at 700 (citations omitted). Our cases make clear, therefore, that the presumption of correctness of a tax assessment, which serves to place the burden of production as well as the burden of persuasion on a plaintiff taxpayer who challenges section 6672 tax liability by seeking a refund of his partial payment, applies with equal force in a collection action where the taxpayer is a defendant.
 
 B. Liability
 
 36
 Appellants contend that they carried their burden of persuasion on the liability issue and challenge the magistrate judge's finding to the contrary. Accordingly, having determined that the magistrate judge correctly allocated the burdens of proof at trial, we proceed to review the merits of the magistrate judge's finding that Nancy was liable for the unpaid taxes pursuant to section 6672.
 
 1. Responsibility
 
 37
 In this Circuit, the issue of whether a person is responsible within the meaning of section 6672 "presents a mixed question of fact and law." Hochstein, 900 F.2d at 547. Accordingly, we review the district court's findings on Nancy's role in the finances at Spinnaker Pole "for clear error," and "give plenary review" to the magistrate judge's conclusion that this role makes her responsible within the meaning of the statute. Id.
 
 
 38
 A person who may be found responsible under section 6672 "includes an officer or employee of a corporation ... who as such officer [or] employee ... is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. Sec. 6671(b). The mere fact that an individual is a corporate officer is not, by itself, sufficient to make that individual a responsible person within the definition of the statute. Rather, "[t]he key element ... is whether that person has the statutorily imposed duty to make the tax payments." O'Connor v. United States, 956 F.2d 48, 51 (4th Cir.1992). This duty, moreover, "is considered in light of the person's authority over an enterprise's finances or general decision making." Id.
 
 
 39
 In determining whether an individual's role in a corporation rises to the level of responsibility "for collecting and paying withholding taxes" within the meaning of the statute, we look to "several factors ..., including the individual's duties as outlined in the corporate bylaws, his ability to sign checks, his status as an officer or director, and whether he could hire and fire employees." Hochstein, 900 F.2d at 547. "The central question, however, is whether the individual has significant control over the enterprise's finances." Id.
 
 
 40
 Here, Nancy was the president of Spinnaker Pole and had signatory authority for the corporation as demonstrated by her acting alone on behalf of Spinnaker Pole to make the purchase offer for the Restaurant. The district court found, moreover, that she owned 60 percent of the stock in the corporation. Although she testified that she knew nothing about the books, her deposition testimony introduced on cross-examination indicated otherwise. Indeed, in that deposition she testified that she was Spinnaker Pole's bookkeeper. Admittedly, she testified at trial that her deposition testimony was in error on this subject and that she was generally ignorant of the overall financial situation of the Restaurant. Nevertheless, she admitted that it was her responsibility to make "sure that everyone got paid." Her insistence, moreover, that she carried out this responsibility, as well as the bookkeeping, by delegating those responsibilities to other individuals, is not, without more, sufficient to carry her burden of proving that she was not a responsible person. Accordingly, we conclude from the evidence presented at trial that the magistrate judge did not err in concluding that Nancy was a responsible person within the meaning of section 6672.
 
 2. Willfulness
 
 41
 While we are mindful that "the question of willfulness in this context normally is a question of fact," we have, nonetheless, reviewed a district court's ultimate conclusion on that issue "as a matter of law." Hochstein, 900 F.2d at 548. Accordingly, we review the magistrate judge's finding that Nancy's failure to withhold taxes was willful under the same standard by which we reviewed the issue of responsibility.
 
 
 42
 We have said that "[a] person willfully fails to pay withholding taxes within the meaning of section 6672 when [she] pays other creditors with knowledge that withholding taxes are due." Id. "The individual's bad purpose or evil motive in failing to collect and pay the taxes," moreover, " 'properly play[s] no part in the civil definition of willfulness.' " Id. (quoting Monday v. United States, 421 F.2d 1210, 1216 (7th Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970)).
 
 
 43
 The Supreme Court cautions, however, that section 6672 "cannot be construed to impose liability without fault." Slodov v. United States, 436 U.S. 238, 254, 98 S.Ct. 1778, 1789, 56 L.Ed.2d 251 (1978). Nor does mere negligence constitute willfulness under the statute. See Feist v. United States, 607 F.2d 954, 961, 221 Ct.Cl. 531 (1979). Rather, "willfulness may be established by a showing of gross negligence involving a known risk of violation." Ruth, 823 F.2d at 1094. We have noted, moreover, that "[w]illful conduct also includes failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the Government." Kalb v. United States, 505 F.2d 506, 511 (2d Cir.1974), cert. denied, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); see also Wright v. United States, 809 F.2d 425, 427 (7th Cir.1987) (articulating three part test to determine willfulness of taxpayer's inaction with respect to payment of withholding taxes). At a minimum, therefore, the willfulness element denotes "a reckless disregard for obvious or known risks" and the failure to pay withholding taxes must be "voluntary, conscious and intentional--as opposed to accidental." Monday, 421 F.2d at 1215-16.
 
 
 44
 Here, Nancy's claim of ignorance regarding the financial affairs is insufficient to refute evidence that she was aware of the payroll aspects of the business including the need to pay withholding taxes. She and Ellison were the only officers of the corporation in which Nancy was the majority stockholder and she testified that she made sure that people got paid. She acknowledged that she occasionally signed checks. The magistrate judge found, moreover, that she was involved in virtually every other aspect of the business. 826 F.Supp. at 1490. Finally, Nancy admitted that she was aware that withholding taxes were due. Although the magistrate judge found that it was "unclear from her testimony at what point in time" she became aware of that obligation, he further found that there was no evidence to indicate that she made any effort to investigate or correct the problem. Id. In light of these findings and the evidence, we find it difficult to conclude other than that her failure to pay the withholding taxes was willful under the statute. Accordingly, we agree with the magistrate judge that Nancy is liable for the unpaid withholding taxes under section 6672.
 
 III. Priority of the Federal Tax Liens
 
 45
 Because we are satisfied as to the validity of the underlying tax liability in this case, we next must determine the priority of the tax liens arising thereunder. We are required, therefore, to unravel the relative priorities and validity of all the interests in the Property as governed by the applicable law.
 
 
 46
 Federal tax liens are creatures of federal law. Section 6321 of Title 26 "authorizes the imposition by the Government of a tax lien upon property of the taxpayer when [she] is in default." United States v. 110-118 Riverside Tenants Corp., 886 F.2d 514, 518 (2d Cir.1989), cert. denied, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990). A lien imposed pursuant to section 6321, moreover, is deemed to arise at the time that the assessment is made and continues until the amount of liability set forth in the assessment is satisfied. 26 U.S.C. Sec. 6322.
 
 
 47
 By the same token, the relative priority of a federal tax lien is governed by federal law. United States v. Equitable Life Assurance Soc'y, 384 U.S. 323, 328, 330, 86 S.Ct. 1561, 1564, 1565, 16 L.Ed.2d 593 (1966); see also Hartford Provision Co. v. United States, 579 F.2d 7, 9 (2d Cir.1978) ("[p]riority of liens under 26 U.S.C. Sec. 6323 is a matter of federal law"); PPG Indus. v. Hartford Fire Ins. Co., 531 F.2d 58, 61 (2d Cir.1976). In general, "priority as a lienor is determined by the ... rule of 'first in time is the first in right.' " Don King Prods. v. Thomas, 945 F.2d 529, 533 (2d Cir.1991) (quoting United States v. City of New Britain, 347 U.S. 81, 87-88, 74 S.Ct. 367, 371, 98 L.Ed. 520 (1954)). Where the priority of the federal tax lien is challenged by a subsequent purchaser and/or the holder of a security interest in the encumbered property, however, the relative priority of the interests is controlled by 26 U.S.C. Sec. 6323.
 
 
 48
 Section 6323(a) provides that a federal tax lien "shall not be valid as against any purchaser [or] holder of a security interest ... until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary." With respect to real property, the notice requirement under the statute requires proper filing of the tax lien pursuant to the laws of the state "in which the property subject to the lien is situated." 26 U.S.C. Sec. 6323(f)(1)(A)(i). Where, as here, the property is situated in a state that invalidates a deed against a bona fide purchaser unless the filing of that deed has been recorded, a race-notice state, see Goldstein v. Gold, 106 A.D.2d 100, 101-02, 483 N.Y.S.2d 375, 377 (2d Dep't 1984) (New York is a race-notice state requiring that a subsequent purchaser have no notice of prior purchase or lien and "win the race to the recording office"), aff'd in part, 66 N.Y.2d 624, 485 N.E.2d 239, 495 N.Y.S.2d 32 (1985), notice of the federal tax lien "shall not be treated as meeting the ... requirements" with respect to such a purchaser "unless the fact of filing [the tax lien] is entered and recorded in [an] index ... in such a manner that a reasonable inspection of the index will reveal the existence of the lien." 26 U.S.C. Sec. 6323(f)(4).
 
 
 49
 Thus, in a priority dispute between the interests of a purchaser or holder of a security interest in property located in New York state and the interests of the government in a federal tax lien on that same property, section 6323(f)(4) effectively transforms the priority determination in New York from one of "first in time is first in right" into one in which the first to record is the first in right. Where, as here, appellants recorded the conveyance before the government recorded its tax liens, a finding that appellants are protected persons under section 6323(a) would render their interests in the Property prior to that of the tax liens.
 
 
 50
 We note, however, that an important distinction exists as to the status of the 1982 and 1984 tax liens in the context of this litigation. Because federal tax liens arise on the date that the underlying tax assessment is made, 26 U.S.C. Sec. 6322, the 1982 tax lien arose on June 14, 1982, the date of the 1982 tax assessment, whereas the 1984 tax lien did not arise until April 16, 1984, the date of the 1984 assessment. The 1982 tax lien, then, attached to the Property before Nancy conveyed it to Mary and Kelly. As such, that lien remains on the Property regardless of whether or not the conveyance is set aside, absent a finding that Mary and Kelly are purchasers entitled to the protection of section 6323(a). See Don King Prods., 945 F.2d at 533; see also United States v. Bess, 357 U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135 (1958) ("transfer of property subsequent to the attachment of the lien does not affect the lien, for 'it is the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere' ") (citation omitted); United States v. Cache Valley Bank, 866 F.2d 1242, 1244-45 (10th Cir.1989) (unless third party comes within protection of section 6323, third party holds property subject to tax lien and "lien also attaches to after-acquired property" because transfer of property subsequent to attachment of lien does not affect lien). By contrast, the 1984 tax lien arose on the Property after Nancy conveyed it to her daughters. Thus, absent a set aside of that conveyance under state law, the 1984 tax lien could not arise on 74 Meadow Creek Lane or any other property in which Nancy, the assessed individual, did not have a legal interest at the time liability was assessed.
 
 
 51
 With this in mind, we interpret the government's case at trial as asserting priority over appellants' interests under different theories with respect to each lien. First, as to the 1982 tax lien, the government contended only that its interest in the Property was prior to those of the appellants under section 6323, the applicable federal law governing priority of federal tax liens. Specifically, it argued that appellants were not protected persons within the meaning of section 6323(a), i.e., that appellants were neither purchasers nor holders of security interests as defined by section 6323(h). Thus, the government insisted that appellants could not invoke the protections of section 6323(a) and (f)(4).
 
 
 52
 As to the 1984 tax lien, however, the government argued that the conveyance of the Property from Nancy to Mary and Kelly should be set aside altogether as fraudulent under New York law. In support of its fraudulent conveyance claim, the government offered two theories of fraudulent intent under New York law: (1) constructive fraud where the conveyance is presumptively fraudulent when made for inadequate consideration regardless of the intent of the transferor pursuant to N.Y. Debtor & Creditor Law Sec. 273 (section 273), and (2) actual intent to defraud pursuant to N.Y. Debtor & Creditor Law Sec. 276 (section 276). Without a finding of fraud, however, the government's 1984 tax lien could not reach the Property since it attached at a time when Nancy, the assessed individual, no longer held an interest in the Property. At trial, therefore, the government's fraudulent conveyance claim was directed only to the latter of the two tax liens on the theory that the conveyance was motivated by Nancy's attempt to defeat the validity of the 1984 tax lien.
 
 
 53
 The magistrate judge, however, subsumed his analysis of the government's theory with respect to the 1982 tax lien--section 6323--in his analysis of the government's theory with respect to the 1984 tax lien--fraudulent conveyance. He reasoned that because New York law does not distinguish "between present and future creditors, I will be considering the fraudulent conveyance argument as in light of the June 14, 1982 tax assessment as well." 826 F.Supp. at 1495 n. 22. He then proceeded to set aside the conveyance as both constructively fraudulent and actually fraudulent under New York law. By finding constructive fraud, moreover, the magistrate judge concluded that "due to the lack of fair consideration given for the property, defendants Mary and Kelly McCombs cannot be purchasers within the meaning of 26 U.S.C. Sec. 6323(h)(6)." Id. at 1497.
 
 
 54
 Not surprisingly then, appellants' primary quarrel with the district court's determination of the priority of interests in this case involves the magistrate judge's determination that Nancy's conveyance of the Property to Mary and Kelly was fraudulent as a matter of New York law. Appellants contend that the magistrate judge's analysis of the fraudulent conveyance claim was skewed legally and factually and thus deprived the daughters of the protection to which they would otherwise have been entitled under section 6323(a) in determining the relative priority of their interests with respect to the tax liens. Appellants argue, moreover, that the magistrate judge's fraudulent conveyance analysis infected his finding that Robert could not invoke protection under 26 U.S.C. Sec. 6323 with respect to his security interest in the Property. We agree with the appellants' position.
 
 A. Fraudulent Conveyance
 
 55
 We turn first to the primary issue raised by the parties on appeal with respect to the foreclosure dispute: whether the conveyance from Nancy to her daughters must be set aside as fraudulent under New York law. We note at the outset that the validity of the conveyance in this case is governed by New York law. See Aquilino v. United States, 363 U.S. 509, 512-13, 80 S.Ct. 1277, 1279, 4 L.Ed.2d 1365 (1960) ("federal ... courts must look to state law" to ascertain whether a taxpayer has a property interest in property subjected to a federal tax lien). In setting aside the conveyance as fraudulent, the magistrate judge relied on two separate grounds, both of which are codified under article 10 of New York's Debtor & Creditor Law by virtue of that state's adoption of the Uniform Fraudulent Conveyance Act. See generally N.Y. Debt. & Cred. Law Secs. 270-281 (McKinney 1990). First, the magistrate judge found that the conveyance was fraudulent per se under section 273, the constructive fraud provision, because, regardless of the appellants' intent, Nancy was an "insolvent person" who conveyed the Property for less than fair consideration. Second, the magistrate judge found that, even if the conveyance was not fraudulent per se under section 273, Nancy conveyed the Property with the intent to defraud creditors, such as the government, and thus, the conveyance ran afoul of section 276.
 
 1. Section 273
 
 56
 Section 273 states: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to [her] actual intent if the conveyance is made or the obligation is incurred without a fair consideration." (emphasis added). Thus, "[s]ection 273 ... covers constructive, as opposed to actual, fraud." Southern Indus. v. Jeremias, 66 A.D.2d 178, 181-82, 411 N.Y.S.2d 945, 948 (2d Dep't 1978). To establish a fraudulent conveyance under this provision, therefore, the government must prove that (1) Nancy conveyed the Property to her daughters, (2) Nancy was or would thereby have become insolvent at the time she made the conveyance, and (3) she made the conveyance without fair consideration.
 
 
 57
 It is undisputed that the first of these elements was established. Appellants concede, moreover, that Nancy was insolvent at the time of the transfer under New York law. Appellants' attack, therefore, is primarily confined to the third element, namely, the magistrate judge's determination that the conveyance was made without fair consideration.
 
 
 58
 a. Burden of Proof
 
 
 59
 As an initial matter, we disagree with the magistrate judge's decision to deviate from the general rule that the party asserting the claim of fraudulent conveyance bears the burden of establishing the element of unfair consideration. See American Inv. Bank v. Marine Midland Bank, 191 A.D.2d 690, 691-92, 595 N.Y.S.2d 537, 538 (2d Dep't 1993); Marine Midland Bank v. Murkoff, 120 A.D.2d 122, 126, 508 N.Y.S.2d 17, 20 (2d Dep't 1986), appeal dismissed, 69 N.Y.2d 875, 514 N.Y.S.2d 1029, 507 N.E.2d 322 (1987). In shifting the burden to the appellants on this issue, the magistrate judge reasoned that the intrafamily nature of the conveyance created a presumption that shifted the burden of proving the fairness of the consideration to the appellants as a matter of law. See 826 F.Supp. at 1496. After reviewing the applicable law, however, we believe that the fairer approach, in a case like this, where the only issue under section 273 is whether the consideration given constituted "fair" consideration relative to the fair market value of the Property, as opposed to disputes over the specific nature or value of the consideration itself, would be to leave the burden for establishing unfair consideration under section 273 with the party asserting the fraudulent conveyance claim.
 
 
 60
 Presumptions and other matters related to the burden of proof are considered matters of substantive law, governed by the law of the jurisdiction whose substantive law applies to the merits of the question in issue. See Dick v. New York Life Ins. Co., 359 U.S. 437, 446, 79 S.Ct. 921, 927, 3 L.Ed.2d 935 (1959) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)); 9 Wright & Miller Sec. 2409, at 337. Since the government seeks to set aside the conveyance as fraudulent under New York law, it follows that New York law governs the allocation of burden of proof on that issue.
 
 
 61
 In general, a fraudulent conveyance claim brought under section 273 places "[t]he burden of proving ... the lack of fair consideration ... upon the party challenging the conveyance." American Inv. Bank, 191 A.D.2d at 692, 595 N.Y.S.2d at 538. There is some authority under New York law, however, for the view that "where the evidentiary facts as to the nature and value of the consideration are within the transferee's control, the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee[,]" ACLI Gov't Sec. v. Rhoades, 653 F.Supp. 1388, 1391 (S.D.N.Y.1987) (emphasis added), aff'd mem., 842 F.2d 1287 (2d Cir.1988), "and the [burden of proving the] fairness of the consideration therefor, should be cast upon the transferees," Gelbard v. Esses, 96 A.D.2d 573, 576, 465 N.Y.S.2d 264, 268 (2d Dep't 1983). Where the transaction involves family members, moreover, and the transaction was made without any tangible consideration, "a heavier burden is placed upon the grantee to demonstrate fair consideration for the transfer." Liggio v. Liggio, 53 A.D.2d 543, 549, 385 N.Y.S.2d 33, 39 (1st Dep't 1976); see also Rhoades, 653 F.Supp. at 1391; Orbach v. Pappa, 482 F.Supp. 117, 119 (S.D.N.Y.1979).
 
 
 62
 By contrast, we can find no authority under New York law for shifting the burden of proving fair consideration to a grantee where, as here, the evidentiary facts as to the nature and value of the consideration are not exclusively within the control of the transferee. Rather, our review of the case law and possible rationales for shifting the burden in a fraudulent conveyance claim brought under section 273 convinces us that New York law would not shift the burden of persuasion in this case where the evidence of the specific value and nature of the consideration was available to the creditor and the only issue to be decided is whether the value of that consideration approaches the fair market value of the property in issue.
 
 
 63
 Our conclusion derives, first and foremost, from an examination of the facts in cases where the courts have shifted the burden. In both Liggio and Esses, the two New York cases on point, the transactions in issue either involved no tangible consideration or involved consideration of which the nature and value were within the exclusive control of the transferee. Specifically, in Liggio, the plaintiff, a divorced spouse, challenged her deceased ex-husband's "clandestine" conveyance of property to his mother, without any tangible consideration, for the purpose of concealing the defendant husband's assets. The trial court granted defendants' motion to dismiss on the ground that plaintiffs had failed to state a prima facie case. On appeal, the Liggio Court, noting both the clandestine nature of the transfer, 53 A.D.2d at 549, 385 N.Y.S.2d at 39, and the fact that defendants "without calling any witnesses or otherwise rebutting plaintiffs' case, ... rested and moved to dismiss the complaint for failure to make out a prima facie case," 53 A.D.2d at 545, 385 N.Y.S.2d at 35-36, found that defendants had failed to carry the "heavier" burden of "demonstrat[ing] fair consideration for the transfer," a burden associated with "an intrafamily transaction such as the conveyance herein," and ordered the conveyance set aside. 53 A.D.2d at 549, 385 N.Y.S.2d at 39, 40 (emphasis added).
 
 
 64
 In Esses, the court was confronted with an allegedly fraudulent transfer of assets held by a family corporation. Esses, 96 A.D.2d at 575, 465 N.Y.S.2d at 267. The transfer of assets was made pursuant to a complicated and intricate agreement involving the exchange of assets and stock interests in corporations pursuant to certain corporate security agreements between family members. 96 A.D.2d at 573-75, 465 N.Y.S.2d at 265-67. In light of the nature of this transaction, the court concluded that "the evidentiary facts as to the nature and value of the consideration are within the transferees' control " and, therefore, "the burden of coming forward with evidence disclosing the nature and value of the security interest furnished by the corporation in return for the transferees' loan ... should be cast upon the transferees." 96 A.D.2d at 576, 465 N.Y.S.2d at 268 (emphasis added). The court added that this was particularly appropriate in this case "because the Bankruptcy Court did not authorize the creation of a security interest in the assets of the corporation ... but rather, merely authorized [the family defendants] to furnish collateral in the form of their stock interests." Id.
 
 
 65
 Our review of these and other New York cases, moreover, furnishes us with two possible rationales for why the specific nature of the transactions in intrafamily conveyance cases could warrant the placing of the burden on the grantee. First, it is clear that New York law creates a presumption of fraud in fraudulent conveyance cases, such as Liggio, where the conveyance was made without evidence of any tangible consideration. See Gafco, Inc. v. H.D.S. Mercantile Corp., 47 Misc.2d 661, 665, 263 N.Y.S.2d 109, 115 (N.Y.C.Civ.Ct.1965); Campbell v. Brown, 268 A.D. 324, 328, 51 N.Y.S.2d 310, 313 (3d Dep't 1944), appeal dismissed, 294 N.Y. 702, 60 N.E.2d 849 (1945); Babylon Plumbing & Heating Supply Corp. v. Kahn, 249 A.D. 830, 830, 292 N.Y.S. 394, 394 (2d Dep't 1937); cf. Boessneck v. Cohn, 7 N.Y.S. 620, 621 (N.Y.Sup.Ct.1889) (a substantial excess between the value of personal property transferred and the amount of debt to be secured does not of itself raise a presumption of fraud). Second, the clandestine nature of the specific intrafamily transactions in the cases where courts have shifted the burden to the transferee creates a situation where the evidentiary facts as to the nature and value of the consideration may be exclusively within the transferee's control thereby requiring that the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee. See also Rhoades, 653 F.Supp. at 1390 (where conveyance was made "for $1.00 and unspecified 'other good consideration ' ") (emphasis added). Thus, we are satisfied that shifting the burden of persuasion to an intrafamily transferee is triggered under New York law by the presence of one of two factors in the conveyance: (1) the absence of any tangible consideration, or (2) a clandestine transfer of property designed to conceal the nature and value of the consideration.
 
 
 66
 We find neither of those factors to be implicated in this case. First, despite the government's suggestion to the contrary, we agree with the magistrate judge that the assumption of and agreement to pay the Columbia Bank and Marine Midland mortgages by the daughters constitutes tangible consideration under New York law. See Eskelson v. Inter-County Title Guar. & Mortgage, 207 N.Y.S.2d 27, 29 (N.Y.Sup.Ct.1960); Onondaga County Sav. Bank v. Markson Bros., 182 Misc. 954, 957, 52 N.Y.S.2d 148, 151 (Onondaga Co.Ct.), aff'd, 263 A.D. 794, 32 N.Y.S.2d 109 (4th Dep't 1941); cf. Schmitt v. Morgan, 98 A.D.2d 934, 936, 471 N.Y.S.2d 365, 367 (3d Dep't 1983) (finding that conveyance based on oral promise to take over mortgage payments for insolvent debtor, to allow debtor to reside at property, and to reconvey property to debtor's son at later date constituted a promise of future support rather than consideration), appeal dismissed, 62 N.Y.2d 914, 467 N.E.2d 893, 479 N.Y.S.2d 9 (1984). Thus, we are satisfied that this is not a case where property was conveyed without any tangible consideration, and agree with the magistrate judge that the central issue here is simply whether the consideration was not "fair" because it was less than the Property's fair market value.
 
 
 67
 Second, we find nothing clandestine about the conveyance that would justify the placing of an evidentiary burden on the appellants to come forward with evidence exclusively within their control concerning the nature and value of the consideration. The government does not contend that it is unable to determine the precise parameters of the consideration paid by the daughters. Indeed, it was the government that introduced documentary evidence of the nature and terms of the consideration. Appellants, moreover, do not deny the specific terms of the consideration nor does the record contain any evidence of an attempt on the part of the appellants to conceal those terms from the government.
 
 
 68
 In the absence of any of the above factors, we can find no overriding basis under New York law to create a presumption of fraud in this case solely because the conveyance was between family members. Indeed, we are at a loss to understand why the intrafamily nature of the conveyance has any relevance whatsoever to whether the assumption of outstanding mortgages on the Property approximated the fair market value of the Property, the ultimate issue in this section 273 claim. Because we can find no basis in policy or law to establish that the New York Court of Appeals would extend Liggio and Esses to this case, we believe it only fair that the burden of proving that the consideration was disproportionately less than the fair market value of the Property remains with the government, the party asserting the fraudulent conveyance claim.[1]
 
 
 69
 b. Calculating the Value of the Consideration
 
 
 70
 Next, we turn to the issue of whether the consideration given in this case was in fact "fair" as that term applies in section 273. We do so, however, simply to correct a factual finding by the magistrate judge that we believe to be both "clearly erroneous" and material to the determination that the consideration was not fair under section 273. Accordingly, we offer no view, after correcting for this error, on the merits of the government's fraudulent conveyance claim under section 273.
 
 
 71
 To this end, we note that despite New York's attempt to codify when "fair" consideration is given, see N.Y. Debt. & Cred. Law Sec. 272 (McKinney 1990) (section 272),[2] our review of the case law convinces us that the concept can be an elusive one that defies any one precise formula. Indeed, "[w]hat constitutes fair consideration under [section 272] must be determined upon the facts and circumstances of each particular case." Orbach, 482 F.Supp. at 119 (citing Halsey v. Winant, 258 N.Y. 512, 523, 180 N.E. 253, 256, cert. denied, 287 U.S. 620, 53 S.Ct. 20, 77 L.Ed. 539 (1932)).
 
 
 72
 Based on the facts and circumstances in this case, the parties agree that the inquiry into the sufficiency of the consideration given for the Property turns primarily on whether the value of the assumed mortgages approached the relative value of the Property. In concluding that it did not, the magistrate judge made a factual finding as to the monetary value of the consideration that is clearly erroneous. Specifically, in determining that value, the magistrate judge incorrectly found that the daughters assumed only the Columbia Bank mortgage whereas they took the Property subject to the Marine Midland mortgage, the second and larger of the mortgages on the Property. 826 F.Supp. at 1497. A review of the terms of the conveyance set forth in the deed, however, unequivocally shows that the daughters "assume[d] and agree[d] to pay " the Marine Midland mortgage as well as the Columbia Bank mortgage as consideration given for the Property. (emphasis added). Because we believe this distinction is crucial to determining the fairness of the consideration under the method utilized by the magistrate judge, we pause to review the magistrate judge's finding as to the precise value of the consideration given by the daughters before proceeding to evaluate its "fairness" under New York law.
 
 
 73
 The district court found the value of the Property to be $85,657. Id. It then credited the principal balance on the Columbia Bank mortgage assumed by the daughters, $10,469.29, as consideration for the conveyance. Id. Because the magistrate judge was under the misconception that the daughters took the Property subject to rather than in assumption of the $47,328.65 balance remaining on the Marine Midland mortgage, however, he refused to credit that additional amount towards the value of the consideration. Instead, he reasoned that the conveyance of the Property subject to the Marine Midland mortgage served only to reduce the relative value of the Property conveyed to the daughters by $47,328.65, the amount of the balance remaining on the Marine Midland mortgage, and thereby reduced the relative value of the Property from its fair market value of $85,657 to "$39,328.35 [sic]." Id. Using the latter figure, the magistrate judge found that Kelly and Mary received property valued at $39,328.35 in return for consideration valued at $10,469.29 and concluded that the value of the Property conveyed was nearly four times greater than the amount of consideration paid. Id.
 
 
 74
 By contrast, had the magistrate judge credited Mary and Kelly with the assumption of both mortgages as set forth in the deed, the total consideration given would have been the sum of the outstanding balances on both mortgages or $57,797.94. Because the daughters assumed, rather than took subject to, the Marine Midland mortgage, moreover, the fair market value of the Property, under the method of analysis employed by the magistrate judge, would remain at $85,657 rather than being reduced by the outstanding balance of the Marine Midland mortgage because, like the Columbia Bank mortgage, the daughters assumed rather than took subject to its obligation. Under his approach, therefore, the magistrate judge should have evaluated the adequacy of consideration valued at $57,797.94 given for Property with a fair market value of $85,657.
 
 
 75
 In our view, therefore, the government's fraudulent conveyance claim under section 273 rises or falls on whether it can prove that consideration of $57,797.94 is disproportionately unequal to the value of the Property as considered in the context of a forced foreclosure proceeding. Here, however, the magistrate judge not only improperly allocated the burden of proof, an error of law, but made a clearly erroneous factual finding that the daughters took the Property subject to rather than in assumption of the Marine Midland mortgage. Accordingly, the analysis underlying the finding that the daughters gave inadequate consideration under section 273 is tainted and requires us to remand the issue for further findings by the district court after correcting for these errors of law and fact.
 
 2. Section 276
 
 76
 In addition to setting aside the conveyance as constructively fraudulent under section 273, the district court set aside the conveyance as actually fraudulent under section 276. Section 276 provides:
 
 
 77
 Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.
 
 
 78
 N.Y. Debt. & Cred. Law Sec. 276 (emphasis added). Thus, unlike section 273 which creates constructive fraud by virtue of the lack of fair consideration, section 276 focuses on the "actual intent" of the transacting parties. Indeed, where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given.
 
 
 79
 The burden of proving "actual intent" is on the party seeking to set aside the conveyance. Marine Midland Bank, 120 A.D.2d at 126, 508 N.Y.S.2d at 20; see also Rhoades, 653 F.Supp. at 1394. "Actual intent" to defraud, moreover, must be proven by clear and convincing evidence. Rhoades, 653 F.Supp. at 1394. While the issue of intent is normally a question of fact under New York law, we will review the district court's ultimate conclusion that the conveyance was fraudulent under section 276 de novo as an issue involving the application of law to fact. See In re Hygrade Envelope, 366 F.2d at 588.
 
 
 80
 Under section 276, "[t]he fraudulent nature of a conveyance may be inferred from the relationship among the parties to the transaction and the secrecy of the sale, or from inadequacy of consideration and hasty, unusual transactions." In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1041 (2d Cir.1984) (citing United Parcel Serv. v. Jay Norris Corp., 102 Misc.2d 231, 233, 423 N.Y.S.2d 125, 127 (N.Y.Sup.Ct.1979); Gafco Inc., 47 Misc.2d at 664-65, 263 N.Y.S.2d at 114).
 
 
 81
 Here, it is undisputed that Nancy had a close relationship with her daughters and that she continued to reside at the Property after the conveyance. The magistrate judge found, moreover, that Nancy was aware of her indebtedness to the government by virtue of the 1982 assessment, an IRS agent having left his business card at her residence several days prior to the conveyance. 826 F.Supp. at 1498.
 
 
 82
 On the other hand, the government introduced the written memorandum of an IRS agent who had interviewed Nancy and noted her explanation that the transfer had been motivated by her financial inability to pay Columbia Bank and Marine Midland. Additionally, the conveyance was close in time to Nancy's October 1982 wedding to Jon Ellison, providing at least indirect support for appellants' claim that the transfer was motivated by Nancy's desire to keep the property exclusively in the McCombs family. Finally, as previously noted, the conveyance was supported by some tangible consideration and the transaction was not unusually clandestine. Thus, while several "badges" of fraud were present to justify an inference of fraud in this case, other evidence was to the contrary.
 
 
 83
 Were the fraudulent conveyance inquiry merely a battle between the "badges" on the one hand and inferences of Nancy's nonfraudulent motivation on the other, we would be reluctant to disturb the magistrate judge's finding of actual fraudulent intent requiring a set aside of the conveyance under section 276. Our reading of the magistrate judge's analysis of the issue, however, convinces us that it was infected by the same errors that tainted the fraudulent conveyance inquiry under section 273. A central factor relied on in the magistrate judge's finding of fraudulent intent under section 276 was his finding that the Property was conveyed for inadequate consideration. See 826 F.Supp. at 1498. As discussed previously, however, this finding was flawed both legally and factually. To the extent that the magistrate judge relied on the inadequacy of the consideration to infer fraudulent intent under section 276, therefore, such an inference was necessarily infected by the legal and factual flaws underlying the initial consideration analysis and must be reconsidered on remand in light of any corrected findings on the consideration issue.[3]
 
 B. Section 6323(a)
 
 84
 Despite the magistrate judge's reliance on a state law fraudulent conveyance theory in determining the priority of the 1982 tax lien, the record is clear that the government's argument for foreclosure on that particular lien was predicated solely on its claim that Mary and Kelly were not entitled to protection under section 6323(a) because they were not "purchasers" within the meaning of the statute. See 26 U.S.C. Sec. 6323(h)(6). In light of the government's view of its own case, a view expressed in both its opening and closing statements at trial, as well as our concern that state fraudulent conveyance law may be irrelevant to the dispute over the 1982 tax lien in this case, see note 3, we instruct the magistrate judge, on remand, to decide the case as it was tried and not to substitute, sua sponte, other theories on a party's behalf. See, e.g., 826 F.Supp. at 1495 n. 22. Accordingly, on remand, the magistrate judge, in reconsidering foreclosure predicated on the 1982 tax lien, need determine only whether or not Mary and Kelly are "purchasers" under section 6323(a).
 
 
 85
 Notwithstanding the government's primary reliance on section 6323(a), moreover, the magistrate judge failed to address the issue in any detail because he found the conveyance to be fraudulent under state law. Apparently, the magistrate judge, like the government, viewed the inquiry as to whether Mary and Kelly were "purchasers" under section 6323(a), and thus protected under federal law, as essentially identical to that of state fraudulent conveyance law under section 273; namely, whether the Property was conveyed for fair consideration. See 826 F.Supp. at 1497.
 
 
 86
 Admittedly, the definition of who is entitled to protection as a "purchaser" under section 6323(h)(6) employs language that is similar to that employed by New York fraudulent conveyance law. Compare 26 U.S.C. Sec. 6323(h)(6) ("purchaser" means "a person who, for adequate and full consideration ... acquires an interest ... in property which is valid under local law against subsequent purchasers without actual notice") with N.Y. Debt. & Cred. Law Sec. 272(b). Section 6323(a), however, is a creature of federal law while the latter is governed by state law. See Don King Prods., 945 F.2d at 543; United States v. Paladin, 539 F.Supp. 100, 103 (W.D.N.Y.1982) ("[t]he requirement of adequate and full consideration [under section 6323(h)(6) ] is a matter of federal rather than state law and must be strictly applied") (citing Continental Oil Co. v. United States, 326 F.Supp. 266, 270-71 (S.D.N.Y.1971)); see also 26 C.F.R. Sec. 301.6323(h)-1(f)(3) (full and adequate consideration under section 6323(h)(6) is an amount "having a reasonable relationship to the true value of the interest in the property acquired" and may include "the consideration in a bona fide bargain purchase"). State fraudulent conveyance law, therefore, is not necessarily dispositive of whether a person will qualify for protection under section 6323(a) in all cases.
 
 
 87
 Here, a finding that Nancy conveyed the Property to her daughters for adequate consideration under New York law, while helpful, does not provide a rule of decision that Mary and Kelly are federally protected "purchasers" under section 6323(a). Accordingly, on remand, the district court should be guided in its analysis of whether Mary and Kelly are "purchasers" under section 6323(a) by applicable federal, rather than state, law.
 
 C. The 1984 Tax Lien
 
 88
 Our decision to vacate the judgment as to the set aside of the conveyance under sections 273 and 276 and to remand those matters for further proceedings, renders the status of the 1984 tax lien an open issue. As we noted earlier in the opinion, a federal tax lien arises on the date that the tax is assessed. 26 U.S.C. Sec. 6322. Here, the 1984 tax lien arose on April 16, 1984, the date that Nancy, the individual found to be personally liable for the additional unpaid payroll taxes, was assessed that additional tax liability under section 6672. In April 1984, however, Nancy no longer held legal title to the Property. Rather, in 1984, title to the Property vested in Mary and Kelly by virtue of the conveyance from Nancy to Mary and Kelly on September 15, 1982. Absent a set aside of that conveyance as fraudulent under New York law, it follows that the 1984 tax lien would be invalid as to 74 Meadow Creek Lane because it was assessed at a time when the individual who incurred the tax liability no longer owned the Property. Accordingly, the judgment of foreclosure on the 1984 tax lien must be vacated and held in abeyance until the fraudulent conveyance claim is resolved on remand.[4]
 
 D. Robert
 
 89
 The relative priority of Robert's security interest, unlike that of Mary and Kelly, turns exclusively on whether he is entitled to invoke the protection of section 6323, the federal statute governing the relative priority of federal tax liens against the interests of subsequent purchasers and holders of security interests. In concluding that he was not so entitled, the magistrate judge found that Robert was "not protected under 26 U.S.C. Sec. 6323(b)(1) as a purchaser or holder of a security interest because he failed to sustain his burden of showing that he 'did not have actual notice or knowledge of the existence of such [tax] lien[s],' for the same reasons that he failed to show lack of knowledge of the fraudulent conveyance of September 15, 1982." 826 F.Supp. at 1500 (alteration in original) (emphasis added) (citation omitted). Appellants contend, however, that Robert primarily qualifies for protection under 26 U.S.C. Sec. 6323(a), not (b)(1), for which actual notice or knowledge of the tax lien is irrelevant.[5] As such, appellants insist that Robert's status under the statute is identical to that of Mary and Kelly and thus whether Robert is entitled to invoke section 6323(a) turns on whether he, like Mary and Kelly, was on record notice of the tax liens. Because the magistrate judge correctly found that the 1982 tax lien was recorded outside the chain of title under New York law, appellants conclude that the government ran afoul of the notice requirements under section 6323(f) with respect to Robert, a subsequent purchaser, as it had with Mary and Kelly and, thus, Robert was entitled to priority over the 1982 tax lien pursuant to section 6323(a). We agree.
 
 
 90
 The statute makes clear that a "holder of a security interest," in addition to a purchaser, comes within the protection of 26 U.S.C. Sec. 6323(a). A security interest under the statute is defined as:
 
 
 91
 [A]ny interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.
 
 
 92
 26 U.S.C. Sec. 6323(h)(1). It is undisputed that Robert holds a security interest in the Property by virtue of his mortgage for $53,000. Thus, the same notice requirements under section 6323(f)(4) that apply to purchasers, in this case Mary and Kelly, apply to Robert, a mortgagee of the Property. See, e.g., United States v. Carson, 741 F.Supp. 92, 94-95 (E.D.Pa.1990) ("For the United States to prevail over a purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor, a notice of the federal tax lien must be on file.").
 
 
 93
 After reviewing the case law, as well as the plain language and legislative history of section 6323, we are satisfied that record notice, as opposed to actual knowledge, of the tax lien is required to deprive a person of section 6323(a)'s protection. See, e.g., TKB Int'l v. United States, 995 F.2d 1460, 1465-66 (9th Cir.1993) (where federal tax liens are recorded outside the subsequent purchaser's chain of title, the liens are not valid against a subsequent purchaser who had actual notice of their existence prior to purchase); United States v. Beaver Run Coal Co., 99 F.2d 610, 613 (3d Cir.1938). Had Congress intended that actual knowledge be required under section 6323(a), it would have expressly said so as it did under subsection (b)(1). Cf. 26 U.S.C. Sec. 6323(b)(1)(A), (B); see also TKB Int'l, 995 F.2d at 1466 n. 4 (citing S.Rep. No. 1622, 83rd Cong., 2nd Sess. 5224 (1954), U.S.Code Cong. & Admin. News 1954, pp. 4017 (deleting provision proposed by the House of Representatives to limit section 6323 to qualified persons who take without actual knowledge); H.R.Conf. Rep. No. 2543, 83rd Cong., 2nd Sess. 78 (1954) (House recedes from Senate's deletion)). Thus, the mere finding that Robert "failed to sustain his burden of showing that he 'did not have actual notice or knowledge of the existence of such [tax] lien[s] ' " cannot deprive him of the statute's protection. 826 F.Supp. at 1500 (alteration in original) (emphasis added) (quoting 26 U.S.C. Sec. 6323(b)(1)(A)).
 
 
 94
 Applying the statute to Robert, it is undisputed that Robert was deprived of the required record notice. Indeed, the magistrate judge's conclusion that the government failed to provide record notice to the current purchasers of record, Mary and Kelly, is dispositive of the government's failure properly to notice Robert, a subsequent holder of a security interest in the Property. See 826 F.Supp. at 1494. Nor does the record contain any evidence that Robert had actual notice of the tax liens. Thus, although Robert recorded his mortgage after the recording of the 1982 tax lien, that lien was recorded outside the chain of title and runs afoul of the notice requirements set forth in section 6323(f)(4), thereby triggering the protection of subsection (a).
 
 
 95
 This conclusion, as long as there was no record notice, however, does not end our inquiry. Although neither party has raised the issue, at least one circuit has intimated that evidence of actual knowledge of a fraudulent conveyance by a subsequent purchaser would render "the result in this case ... 'very different.' " TKB Int'l, 995 F.2d at 1465 n. 4 (citation omitted). The TKB Court, moreover, suggests that "a subsequent purchaser has a duty to look beyond the index" and search the documents that are in the actual chain of title " 'as may have a current effect and must then act on the notice imparted.' " Id. at 1465 (citation omitted). Indeed, the TKB Court would have us look at recorded land records such as the deed in this case to determine whether Robert was put on notice "that the transfer actually was fraudulent and involved no consideration." Id. In short, TKB appears to read a limited good faith requirement into section 6323(a) not as to a person's knowledge of federal tax liens, but as to the person's actual knowledge of a fraudulent conveyance. See id. at 1465 n. 3.
 
 
 96
 Of interest here is the magistrate judge's finding that Robert failed to sustain his burden that he lacked actual knowledge of the federal tax liens "for the same reasons that he failed to show lack of knowledge of the fraudulent conveyance of September 15, 1982." 826 F.Supp. at 1500. Accordingly, Robert's status under section 6323(a) raises two additional issues in this case: (1) whether Congress intended that a mortgagee's actual knowledge of a fraudulent conveyance bars that person from relying on section 6323(a)'s notice protection; and if so, (2) whether sufficient evidence existed to support a finding that Robert had actual knowledge of the fraudulent nature of the transfer between Nancy and the daughters.
 
 
 97
 A negative answer to the second question obviates the need to decide the first, a difficult issue of first impression for this Court with repercussions well beyond this case. Assuming arguendo that actual knowledge of the fraudulent nature of the conveyance of September 15, 1982 would act to bar Robert in this case, a review of the record satisfies us that sufficient evidence of such knowledge with respect to Robert is lacking in this case.
 
 
 98
 As a preliminary matter, the magistrate judge did not find that the evidence affirmatively established that Robert had actual knowledge of a fraudulent conveyance. Rather, our reading of the magistrate judge's finding was that Robert failed to sustain his burden of showing that he lacked such knowledge. 826 F.Supp. at 1500. Because this finding was made in the context of determining whether Robert was entitled to the protection of N.Y. Debtor & Creditor Law Sec. 278 and because the mortgage was an intrafamily transaction, the magistrate judge allocated to appellants the burden of proving that Robert had no knowledge of the fraudulent nature of the conveyance between Nancy and the daughters. Although the magistrate judge found no direct evidence of actual knowledge, he reasoned that the intrafamily nature of the transaction created an inference that Robert had knowledge of the tax liens and knew that the transfer of the Property from Nancy to her daughters "was done fraudulently for the purpose of avoiding her creditor, the United States Government." Id.
 
 
 99
 By contrast, to deprive a person of protection under section 6323(a), a federal statute, the burden and risk of persuading the fact finder that Robert had actual knowledge of a fraudulent conveyance rested with the government. Thus, the magistrate judge's finding that Robert failed to show that he lacked such knowledge is not, without more, sufficient to establish affirmatively that Robert had actual knowledge of the fraudulent conveyance and is in no way dispositive of whether Robert took a mortgage on the Property with actual knowledge that the conveyance to his daughters was fraudulent.
 
 
 100
 Second, the mere fact that the conveyance from Nancy to the daughters was intrafamily is insufficient to establish that Robert was aware of the fraudulent nature of the conveyance. At best, the intrafamily nature of the transaction creates an inference of fraud. Indeed, as discussed above, we cannot conclude that the conveyance was fraudulent as a matter of New York law nor that the consideration set forth on the recorded deed was so inadequate as to put a subsequent purchaser or security interest holder on notice of a fraudulent transfer.
 
 
 101
 Third, assuming that the magistrate judge was correct in drawing the inference from the intrafamily nature of the transfer that Robert was aware of the financial circumstances surrounding the conveyance on September 15, 1982, the record indicates that the tax liens were not the only justification for the transfer. In particular, the government was not the only creditor at the time of the transfer. Rather, significant outstanding balances remained on both the Columbia Bank and the Marine Midland mortgages, interests that were clearly prior to that of the federal government at the time of the conveyance. Concern over possible foreclosure on those mortgages due to Nancy's inability to pay those mortgages was a plausible reason given by Nancy to the IRS as the reason for the conveyance. In addition, Nancy's marriage to Ellison, a family outsider with financial liabilities, provides a second possible reason for the transfer. While we offer no view on the weight to be accorded these justifications for the transfer, we believe they are sufficient to offset an inference that Robert knew of the fraudulent nature of the conveyance where, as here, the government offered no additional direct or indirect evidence of Robert's knowledge concerning the nature of the conveyance at the time he granted the mortgage.
 
 
 102
 Finally, we believe that to deny Robert his $53,000 interest in the Property would work an injustice that the law does not intend. Robert's mortgage enabled Mary and Kelly virtually to extinguish the two prior mortgages on the Property. By eliminating these prior encumbrances, the government's interest in the Property, the federal tax liens, was dramatically improved. By waiting until after the prior encumbrances were extinguished by virtue of Robert's mortgage, the government was able to leap frog those interests at Robert's expense. A result in which Robert, for all practical purposes, forfeits his $53,000 mortgage for the direct benefit of the government interest strikes us as a classic example of unjust enrichment. Because we do not believe that equity warrants such a result, we are satisfied that the application of section 6323(a)'s protection is appropriate in this case.
 
 CONCLUSION
 
 103
 The district court's judgment declaring Nancy liable for the unpaid withholding taxes pursuant to section 6672 is affirmed. The judgment setting aside the conveyance of the Property from Nancy to her daughters as fraudulent under N.Y.Debtor & Creditor Law Secs. 273 and 276 and foreclosing the 1982 and 1984 tax liens on the Property is vacated and remanded for further proceedings consistent with this opinion. Finally, the judgment declaring the federal tax liens prior to Robert's interest in the Property is reversed.
 
 
 
 [1]
 We are cognizant that, under New York statute, "fair consideration" requires not merely that the value of the consideration be roughly equivalent to the property in issue but also that there be good faith on the part of the parties involved in that conveyance. See N.Y.Debt. & Cred. Law Sec. 272 (McKinney 1990) (section 272); Hickland v. Hickland, 100 A.D.2d 643, 645, 472 N.Y.S.2d 951, 954 (3d Dep't 1984); see also In re Fill, 82 B.R. 200, 216 (Bankr.S.D.N.Y.1987) (two prong test for fair consideration requires that even where there is a fair exchange of value, conveyance can be set aside if good faith is lacking). We are not entirely clear from the case law, however, just how the "good faith" requirement under section 272 operates in the context of a fraudulent conveyance claim under section 273, a constructive fraud statute where the issue of intent is irrelevant. See generally Berlenbach v. Bischoff, 137 Misc. 719, 719-21, 244 N.Y.S. 369, 370-71 (N.Y.Sup.Ct.) (discussing the role of intent in the context of a fraudulent conveyance claim governed by N.Y.Debt. & Cred. Law Secs. 272, 273, 276 and 278), aff'd, 231 A.D. 734, 245 N.Y.S. 744 (1930). We see no basis to alter our view that where the consideration has substantial and discernible monetary value, the burden of proof to establish that the consideration was not "fair" remains on the creditor. In any event, the district court did not reach the issue of good faith in its evaluation of the section 273 claim because its calculations, calculations we find to be infected by an erroneous factual determination as to the total monetary value of the consideration for reasons discussed below, demonstrated that the value of the consideration was disproportionately less than the value of the Property conveyed. See 826 F.Supp. at 1497
 
 
 [2]
 N.Y. Debtor & Creditor Law Sec. 272 states:
 Fair consideration is given for property, or obligation,
 a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
 b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.
 
 
 [3]
 We note, moreover, that the magistrate judge also relied on Nancy's inability to pay the assessments and her "knowledge of [ ] her indebtedness to the government well in advance of the transfer of property." 826 F.Supp. at 1498 (emphasis added). We are concerned, however, that this analysis may give insufficient weight to the distinction the government drew at trial between the 1982 and 1984 tax assessments. Indeed, our understanding of the theory of the government's case was that it asserted fraudulent conveyance only as to the 1984 tax assessment. By asserting a fraudulent conveyance theory only as to the 1984 assessment, we understand the government's position at trial to be essentially that the conveyance was motivated by Nancy's desire to defraud the government as to that debt; i.e., an attempt to hinder collection of a $3,091.28 tax liability covering the period of October 1, 1981 through June 30, 1982 and assessed against her on April 16, 1984, nearly 19 months after she conveyed the Property
 Admittedly, the failure to distinguish between the two assessments was inconsequential as to the fraudulent conveyance inquiry under section 273. As discussed earlier, section 273 is a constructive fraud statute that does not focus on the transferor's intent but looks instead to the adequacy of the consideration. Thus, although the magistrate judge considered the fraudulent conveyance claim as to both assessments instead of limiting that analysis to the 1984 assessment as the government asked, the constructive fraud inquiry was identical under either approach: did Nancy convey the Property for full, adequate and fair consideration.
 By contrast, the section 276 inquiry, which focuses not on constructive but actual fraud, turns on a finding of actual intent to defraud. As the magistrate judge correctly noted, actual intent is proved through an inference, at least in part, drawn from the object of or motivation for the alleged fraud. In that sense, the section 276 inquiry varies dramatically depending on what the object of the claimed fraud was alleged to be in this case; i.e., whether Nancy sought to defraud the government from collecting only its debt of $3,091.28, assessed well after the conveyance took place as the government implied at trial or whether, as the magistrate judge held, sua sponte, that the fraud was also designed to hinder the government's collection of its considerably larger 1982 tax assessment of $26,925.79, assessed prior to the conveyance.
 In view of the difference in scope between these inquiries, the magistrate judge may want to consider, notwithstanding New York law's similar treatment of present and future creditors, whether section 276 warrants the bootstrapping of the larger 1982 and smaller 1984 tax assessments, two temporally distinct debts, in determining the issue of Nancy's intent, where, as here, the government argued fraudulent conveyance only as to the latter.
 From that perspective, then, we question the magistrate judge's implicit assumption that Nancy's conveyance of the Property hindered the government's ability to foreclose on its 1982 tax lien. As discussed previously, that lien arose on the Property before the Property was conveyed and, thus, remained on the Property cum onere. Thus, the transfer of ownership from Nancy to the daughters had no legal effect per se upon the validity or priority of the lien. Admittedly, the daughters seek to protect their interest in the Property as "purchasers" under section 6323(a), a claim that, if successful, would invalidate the lien as to that interest and, for all practical purposes, extinguish the lien as to all subsequent interests conveyed by the purchasers. That issue, however, is, as the government argued at trial, despite its practical impact on the government's interest in the property, a priority dispute governed exclusively by federal law under section 6323(a) & (h)(6); i.e., whether the government timely filed notice of the 1982 tax lien and whether the daughters paid full and adequate consideration for the Property. As such, the validity of the 1982 tax lien turns primarily on the timeliness of the government's filing and the adequacy of the consideration paid by the daughters. In the event that the government is unable to foreclose on its 1982 tax assessment because it failed to file its notice in a timely manner before the daughters purchased the Property for fair and adequate consideration, the government only has itself to blame. We question, therefore, whether the government should be allowed to revive a lien deemed invalid under federal law as to the "purchasers" of the Property by ascribing fraudulent intent to its seller, where the conveyance of the Property could not and did not hinder the validity of the lien but for the fact that the government filed its lien untimely.
 In any event, we need not resolve that issue here, because we conclude that the section 276 inquiry was infected by the legal and factual errors that pervade the analysis of the adequacy of consideration.
 
 
 [4]
 Because we are reversing as to the fraudulent conveyance finding, we deem it inappropriate to consider at this time appellants' alternative claim that they were entitled, under N.Y. Debtor & Creditor Law Sec. 278, to keep the Property as a security interest even if the conveyance was deemed fraudulent
 
 
 [5]
 In its brief, the government argues that a mortgage is not a "security" within the meaning of that term as it applies in section 6323(b)(1). Were appellants' claim for relief predicated solely on subsection (b) of the statute, the government's argument would have merit. Appellants, however, do not primarily rely on a claim that Robert's interest is a "security" under subsection (b). Rather the crux of their claim for relief under section 6323 is that the mortgage is a "security interest " as that term applies under subsection (a). Thus, appellants do not need to invoke the protection of subsection (b)
 We think the distinction between a "security interest" in subsection (a) and a "security" as that term applies in subsection (b) is apparent from the statutory structure of section 6323. Subsection (b) is designed to provide supplemental protection to persons not covered by subsection (a)'s protection of "perfected security interests arising before the filing of the tax lien." See Slodov, 436 U.S. at 257 & n. 20, 98 S.Ct. 1778, 1790 & n. 20, 56 L.Ed.2d 251 (1978) (emphasis added). In interpreting section 6323, the Supreme Court has construed subsection (b) as
 mak[ing] superior to the [federal tax] lien, interests of persons who, without actual knowledge of the lien, acquire interests in personal property purchased from retail dealers in the ordinary course of trade, personal property (less than $250) purchased in casual sales, securities, motor vehicles, and real property by virtue of a lien for certain local real property and special assessment taxes, or for mechanic's liens.
 Id. at 257 n. 20, 98 S.Ct. at 1790 n. 20 (emphasis added) (citing 26 U.S.C. Sec. 6323(b)(1)-(7)). A mortgagee who recorded his mortgage under the recording statute of the state and who thereby became a holder of a perfected security interest properly invokes subsection (a) rather than subsection (b). As such, we conclude that the government's claim, like the magistrate judge's finding, that Robert's interest is not protected under subsection (b) of the statute is misplaced.