Barney M. **BAKER**, et al., Plaintiffs,

v.

**POWER SECURITIES CORPORATION,
et al., Defendants.**

Barney M. **BAKER**, et al., Petitioners,

v.

**RAF FINANCIAL CORPORATION,
Respondent.**

No. 89–CV–231L.

United States District Court,
W.D. New York.

Dec. 11, 1996.

Dennis A. Graham, Hopper & Kanouff, Denver, CO, Justin Vigdor, Boylan, Brown, Code, Fowler, Vigdor & Wilson, L.L.P., Rochester, NY, for debtor RAF Financial Corp.

Douglas A. Foss, James M. Hartmann, Harris, Beach & Wilcox, Rochester, NY, H. Todd Bullard, Fix, Spindelman, Turk, Himelein & Shukoff, Rochester, NY, for plaintiffs Barney M. Baker, Kenneth Banks, Edward Coleman, Gail Corsette, Joyce D. Flachen, William F. Horton, Barry A. Friedman, Mark H. Klein, David J. Kuhbinder, John F. Locasio, Joseph M. Natale, Joan M. Halstead, Joanne Herwig, David A. Hodder, Donald Haydoo, Herbert A. Levin, William C. Lowenkamp, Swan Lundeen, Frank Merriweather, Louis J. Micca, Christopher Palmer, Arlene Pearlman, David Phillips, James Rosecrans, Frank Sarwatka, Donald Stubblebin.

Orville Sandberg, Aurora, CO, pro se.

Joe McDonouth, Denver, CO, pro se.

Stephen M. Leonardo, Silver, Feldman & Leonardo, Rochester, NY, for defendant Eric Mohchecourt.

Ira L. Hyams, Ira L. Hyams P.C., Westbury, NY, for defendants Arthur Seidenfeld, Samuel Seidenfeld and Anne Seidenfeld.

Jeff Brown, Aurora, CO, pro se.

John Dennee, Fairport, NY, pro se.

## DECISION AND ORDER

LARIMER, Chief Judge.

### BACKGROUND

This class action was originally commenced by petitioners against Power Securities Corporation ("Power") and other defendants to recover monetary losses sustained by petitioners as a result of alleged securities fraud. On March 20, 1992, a $25 million judgment was entered in favor of petitioners against Power, which had ceased operations in 1989. Plaintiffs thereafter commenced this "turnover" proceeding against RAF Financial Corporation ("RAF" or "respondent") pursuant to Fed.R.Civ.P. 69(a) and N.Y.C.P.L.R. §§ 5225(b) and 5227, which together allow a judgment creditor to satisfy its judgment from money or property held by a third party on behalf of the judgment debtor or out of money or property owed by a third party to the judgment debtor. Petitioners allege that RAF holds money and securities on behalf of Power, and in this proceeding they seek an order compelling RAF to turn over those funds to petitioners to satisfy partially the outstanding judgment.

Pursuant to Fed.R.Civ.P. 69(a), this action is governed by C.P.L.R. § 5225(b), which provides a procedure for a judgment creditor to obtain property of the debtor which is in the possession of a third party. The statute provides in part:

(b) Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, ... where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money ... to a designated sheriff.

This rule, then, "provides for a two-step analysis in determining whether property belonging to a judgment debtor—but in the possession of a third party—should be turned over to a judgment creditor." *Beauvais v. Allegiance Securities, Inc.*, 942 F.2d 838, 840 (2d Cir.1991).

First, it must be shown that the judgment debtor 'has an interest' in the property the creditor seeks to reach. Where this first step is satisfied, the trial court must, second, then make one of two findings: it must find either that the judgment debtor is 'entitled to the possession of such property,' *or* it must find that 'the judgment creditor's rights to the property are superior' to those of the party in whose possession it is. Only after both steps of the

analysis are demonstrated may the trial court order the transferee to turn over the property to the judgment creditor....

*Id.* at 840–41.

## CONTENTIONS OF THE PARTIES

According to petitioners, at the time Power went out of business, RAF had in its possession approximately $1.1 million belonging to Power. Petitioners allege that RAF is still in possession of money and proceeds of Power which should be turned over to petitioners as a judgment creditor. RAF vigorously denies petitioners' allegations and contends that it no longer possesses any money or securities belonging to Power and that Power, in fact, owes it substantial sums for services rendered.

This dispute centers around the reasonableness of certain fees that RAF charged against Power's account. RAF contends that it charged those fees pursuant to a written agreement with Power. Petitioners maintain that even if Power agreed to the fees, the charges are excessive, and that any such agreement was not supported by sufficient consideration. Petitioners also allege that the conveyance by Power of stock to RAF in April, 1989 amounted to a fraudulent conveyance. This transfer was effected to provide RAF with some collateral for debts and obligations it assumed in liquidating Power's accounts.

At issue here is whether the April 11 conveyance by Power to RAF is legally enforceable. Plaintiffs contend that it constituted a fraudulent transfer that may be set aside by the court. In support of this contention, plaintiffs rely on the New York Uniform Fraudulent Conveyance Act ("UFCA"), N.Y.Debt. & Cred.L. ("DCL") §§ 270–281, which "identifies several situations involving 'constructive fraud,' in which a transfer made without fair consideration constitutes a fraudulent conveyance, regardless of the intent of the transferor." *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 633 (2d Cir.1995).

Under DCL § 273–a,

[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

"An essential element of a claim pursuant to DCL [§ 273] is lack of fair consideration." *Atlanta Shipping Corp. v. Chemical Bank,* 818 F.2d 240, 248 (2d Cir.1987). What constitutes fair consideration is set out in § 272, which provides that

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

In addition, "[e]ven where fair consideration is given in exchange for the debtor's property, a transfer may be fraudulent under the UFCA if it is marked by 'actual fraud,' that is, if it is made 'with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." *HBE Leasing,* 48 F.3d at 633–34 (citing DCL § 276).

The main issues then are whether Power received fair consideration for the securities that it transferred to RAF in April 1989 and whether the money remaining in Power's master account at RAF was properly used by RAF to defray expenses and costs incurred by RAF in the liquidation. Power was a defendant in this lawsuit at the time of the conveyance. Therefore, if Power did not receive fair consideration for the stock conveyance, and if RAF wrongfully appropriated Power's assets petitioners could have a claim to such property for purposes of C.P.L.R. § 5225. *Gelbard v. Esses,* 96 A.D.2d 573, 465 N.Y.S.2d 264 (2d Dep't 1983).

### TURNOVER HEARING

The Court took testimony concerning the factual issues raised in this turnover proceeding. The ultimate issue is whether RAF retained assets of Power after Power's demise in February 1989 that can be attached by Power's judgment creditors.

Petitioners claim that there was a substantial sum of money "left" with RAF in the Power master account when Power closed business and that those moneys rightfully belong to Power's creditors, not RAF.

After considering all the proof, however, I do not believe that petitioners have established what they claim. I find as a fact that the money that remained with RAF after Power's closure was properly earned by RAF for services rendered to Power for closing out Power's numerous accounts. The stock transferred to RAF as collateral was also made for fair consideration.

RAF was the clearing broker for Power. As a clearing broker, RAF handled the financial transactions connected with the purchase and sale of a security which had been arranged by a correspondent broker, such as Power. RAF performed all the clerical and back-office services for correspondent brokers. RAF served other correspondent brokers but Power clearly was the client with the largest volume.

In 1988, Power and RAF entered into a written agreement concerning their arrangement. This document was called a "Fully Disclosed Correspondent Agreement" (Ex. 429). Under the Agreement, RAF agreed to perform various services for Power and Power agreed to pay RAF for those services. The Agreement also called for Power to deposit funds with RAF to cover the costs incurred by RAF for the services performed for Power. Under the Agreement, RAF also maintained an inventory account of securities it held on behalf of Power.

The Agreement also contains certain provisions dealing with Power's and RAF's rights and responsibilities in the event of the Agreement's termination. Section 8(f) of the Agreement states that

If the Agreement is terminated for any reason, [Power] will pay to [RAF] such reasonable amounts as [RAF] may determine are necessary to ship securities and credit balances to customers or otherwise dispose of said funds ad [sic] securities. [RAF] may, at its option, withhold such sums from any monies owing to [Power] at the time this Agreement is terminated.

The Agreement also states at § 15(c) that

if this Agreement is terminated (i) all revenues, costs and expenses incurred by [RAF] prior to the date of termination will be paid by [Power] within five (5) days from the date of the event causing the termination or, at [RAF's] option, by deducted by [RAF] from any monies then owing [to Power] and (ii) such termination, for whatever reason, shall have no effect upon any amounts then due to [RAF] under the terms and conditions of the Agreement. [RAF] may retain any portion of monies then owing for as long as 180 days if in [RAF's] sole discretion it is necessary for resolving any dispute resulting from the termination.

During 1988, Power grew dramatically. Some expected that it would eventually become the largest brokerage firm in the country. Because of Power's exponential growth, RAF grew too. RAF's president and chief executive officer, Robert A. Fitzner, testified that during 1988 RAF increased its space and added personnel to attempt to cope with Power's 1,000—1,500 daily transactions. During this time RAF increased its revenue by 100 percent due to Power's activities. Toward the end of 1988, however, RAF had concerns about its continuing relationship with Power. Fitzner testified that he had learned that Power had purchased another correspondent broker and, more importantly, a competing clearing brokerage firm. Fitzner was concerned that Power might abandon RAF, precipitously, and use another clearing broker. RAF's personnel discussed these concerns with Richard Marchese, Power's president.

On February 3, 1989, Power signed its "Fully Disclosed Correspondent Agreement" for 1989 (Ex. 412). In addition, on that same day, Marchese signed an addendum (Ex. 413) to the Correspondent Agreement which, in

essence, guaranteed that Power would use RAF as its clearing broker for the balance of 1989.

Petitioners have intimated in this proceeding, and in the main action, that RAF was somehow aware of Power's imminent demise and that it took steps to profit from it. Petitioners have failed to establish that fact, however. In fact, the evidence suggests that RAF was startled like the rest of the industry when Power abruptly closed on or about February 13, 1989.

Fitzner first learned of Power's troubles when he heard that New York's Attorney General had enjoined Power's activities in New York. In spite of that, Marchese and other Power officials assured RAF that the New York action was not serious and that it would be resolved favorably. Fitzner himself contacted representatives of the National Association of Securities Dealers ("NASD") but they also knew nothing of Power's collapse.

In early February, RAF had released approximately $1.5 million to Power for January's sales and commissions, pursuant to the existing Correspondent Agreement (Ex. 414, 415). Fitzner testified that if he had information that Power was about to close its business the January payments of $1.5 million would most likely not have been made in order to better protect RAF's position.

Within days of that payment, however, Marchese did inform RAF that it was closing business. By letter dated February 17, 1989 (Ex. 418), RAF notified Power that it was in breach of the Correspondent Agreement. From the testimony, it appears that at this time there was approximately $1.1 million in the Power account at RAF. Within the next several weeks there was a flurry of activity and several documents were signed by Power and RAF. In essence, RAF agreed to close out all of Power's accounts and dispense funds and take closing action with respect to Power's 35,000 customers. Fitzner prepared a proposal (Ex. 419) which was transmitted to Marchese for RAF to close down the business. Fitzner estimated that the cost of performing such tasks would be $1.5 million. Marchese authorized RAF to cover all Power's "short" positions in the market at the best buy (Ex. 416). Marchese authorized the transfer of customers' stock positions to RAF for a liquidation (Ex. 417) and he authorized RAF to "disperse" all of Power's accounts as RAF saw fit (Ex. 420).

According to Fitzner, RAF agreed to undertake these tasks for a flat fee of $1.5 million. By agreement dated April 11, 1989 (Ex. 422), entitled "Security Agreement–Pledge" Power pledged all of its own securities as collateral for the $1.5 million obligation. The $1.5 million was charged as a journal entry against Power's account. It is clear, however, that RAF never actually obtained that sum since the account only had $1.1 million when Power closed and only about $40,000 of income was generated from securities in the account during 1989–90.

Fitzner testified that the $1.5 million charge was a flat fee to perform all of the necessary liquidation services for Power. I believe that the proof established that there was an agreement for a flat fee and that the fee agreed upon was reasonable. Both Fitzner and an expert witness, Glen E. Keller, Jr., testified that a fee in that amount for such a liquidation service was quite reasonable.

Keller, a former United States Bankruptcy Court Judge, had significant experience in the liquidation of brokerage houses under provisions of the Securities Investor Protection Act ("SIPA"). He concluded that RAF's charges were reasonable based on the costs incurred and liabilities that the firm faced in liquidating a brokerage firm like Power with over 35,000 customers.

Keller testified that there were significant costs involved in disbursing assets for a firm like Power. These would include personnel costs, overhead charges, mail costs, various transfer fees, including Automatic Customer Account Transfer ("ACAT") fees and Depository Trust Corporation ("DTC") charges. Because of these charges and because of NASD requirements that the broker continue to communicate periodically with the customer, it was a significant burden on RAF to continue to hold stock for customers of the defunct Power firm. Keller testified that the fee charged for RAF's efforts were reason-

able and most likely RAF actually lost money on the arrangement.

Fitzner confirmed that assumption. He testified that RAF lost about $400,000 in 1989 due in part to the expenses and cost related to its involvement with the liquidation of Power. He testified that RAF incurred far more expenses than the $1.1 million balance in the Power account when it closed business.[1]

## BURDEN OF PROOF

■ In a proceeding under § 5225, "the creditor has the burden of establishing that his rights are superior to those of the transferee.... The burden of proof is on the creditor seeking to set aside a conveyance as fraudulent to establish that the debtor's conveyance was made without fair consideration." *Gelbard*, 96 A.D.2d at 576, 465 N.Y.S.2d 264.

Petitioners contend that RAF has the burden of justifying the nature and value of the services it performed as consideration for Power's conveyance of its securities. In support of this contention, petitioners rely upon the statement in *Gelbard* that where the evidence concerning the nature and value of the consideration is within the transferee's control, the burden shifts to the transferee to "com[e] forward with evidence disclosing the nature and value" of the consideration, as well as the fairness of the consideration. *Id.* Petitioners are incorrect, however, in asserting that defendants in such a situation have the burden to "justify" the consideration; *see* Plaintiffs' Memorandum of Law at 3. It is only the burden of *production,* not the burden of *persuasion,* that shifts to the transferee. *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Serv. Co.,* 910 F.Supp. 913, 937 (S.D.N.Y.1995) (citing *United States v. McCombs,* 30 F.3d 310 (2d Cir.1994)).

In addition, I am not convinced that this rule is applicable in the case at bar in any event. In *McCombs,* the Second Circuit held that the burden-shifting described in *Gelbard* will occur only where there is an *intrafamily* conveyance *and* either an absence of *any* tangible consideration, or a *clandestine* transfer of property designed to conceal the nature and value of the consideration. 30 F.3d at 325. The court held that the district court had erred in shifting the burden to the intrafamily transferee in *McCombs* where neither of those two factors was present.

The instant case involves neither an intrafamily transfer, nor a total absence of consideration, nor a clandestine transfer of property. Furthermore, I am not persuaded that the evidence concerning RAF's services that formed the consideration for Power's conveyance is solely within RAF's control at this point, given the vast amount of material that has been produced in this case through discovery.

Even if the burden of production were on RAF, however, I find that RAF has come forward with evidence showing what services it performed, and the value of those services. After hearing the testimony at trial, I am also convinced that those services constituted fair consideration for the conveyance by Power.

"In general, repayment of an antecedent debt constitutes fair consideration ..." *Atlanta Shipping,* 818 F.2d at 249. In the instant case, the transfer by Power was a payment of a debt that RAF had charged against Power's account on February 17, 1989.

## SUMMARY OF FINDINGS AND CONCLUSIONS

■ After hearing the testimony at trial, and reviewing the evidence submitted by

---

1. Only one component of the total amount that RAF charged against Power's account—$103,718 in legal fees related to this litigation—is not directly related to RAF's costs involved in liquidating Power's business. Petitioners contend that this charge was improper because the claims against RAF in the underlying securities fraud case (which have been dismissed) were based upon RAF's own alleged wrongdoing, and were not derivative of Power's alleged wrongdoing. Under the terms of the Correspondent Agreement, RAF could charge Power for attorney's fees only if they were incurred as a result of Power's acts or omissions.

My finding that RAF's charge of $1.5 million was reasonable makes it unnecessary for me to determine whether these attorney's fees were properly charged against Power's account. Since the $1.1 million in assets obtained by RAF fell some $400,000 short of the total amount charged, whether the attorney's fees were properly included makes no real difference for purposes of this decision.

both sides, I find that the conveyance of securities by Power to RAF was supported by adequate consideration, and that plaintiffs are therefore not entitled to recover against RAF. The evidence showed that the charge imposed by RAF for its services in closing out Power's accounts was entirely reasonable. There is no evidence to the contrary.

I find as a fact and conclude that RAF undertook a substantial task in liquidating Power's business and distributing stock and concluding transactions for 35,000 customers. Certainly RAF was entitled to some compensation for its labors which took place over several years. Although the arrangement was for approximately $1.5 million in fact RAF only received approximately $1.1 million. There has been no proof submitted by testimony or other evidence that fees in that amount for RAF's efforts in this type of proceeding were unreasonable. The testimony of Fitzner and Keller stands unrebutted that the fee arrangement for such a task was reasonable.

In sum, this turnover proceeding must be decided against petitioners. There simply is no property or money still existing that belongs to Power for petitioners to attach. All of the money was justly earned by RAF for its extensive labors in dealing with Power's liquidation as the final clearing broker. Petitioners, therefore, have no "interest" in any assets of RAF. RAF has no money or assets belonging to or owed to Power. On this record, with no proof that the fee was excessive or the work negligible there is no basis to conclude that RAF expropriated moneys justly due to Power or its creditors.

### CONCLUSION

The petition against RAF Financial Corporation to enforce petitioners' judgment against Power Securities Corporation from money and assets in the possession of RAF Financial Corporation is dismissed.

IT IS SO ORDERED.